MICHIGAN STATE AFL-CIO v SECRETARY OF STATE

Docket Nos. 206522, 206620. Submitted March 3, 1998, at Lansing. Decided May 22, 1998, at 9:10 A.M.

Michigan State AFL-CIO and its president, Franklin D. Garrison, brought an action in the Ingham Circuit Court against the Secretary of State, seeking declaratory and injunctive relief against the enforcement of a declaratory ruling and interpretative statement issued by the Secretary of State relative to what constitutes annual affirmative consent by a contributor under § 55(6) of the Michigan Campaign Finance Act (MCFA), MCL 169.255(6); MSA 4.1703(55)(6). Section 55(6) provides that certain entities, including labor organizations, may solicit or obtain contributions for a separate segregated fund on an automatic basis, including a payroll deduction plan, if the individuals who contribute affirmatively consent to their contribution at least once in every calendar year. The Secretary of State's declaratory ruling and interpretative statement, issued in response to a request by the Michigan Chamber of Commerce, provided that an affirmative consent must be in writing and signed by the contributor and that such consent remains effective until December 31 of the year in which it is given. The court, William E. Collette, J., allowed the Michigan Chamber of Commerce to intervene as a defendant, allowed the Michigan Education Association to intervene as a plaintiff, and preliminarily enjoined the Secretary of State from applying her declaratory ruling and interpretative statement to the Michigan State AFL-CIO, its political committee, its affiliated organizations, and their political committees. The court noted that the express language of § 55(6) did not include either a signed writing or a December 31 expiration requirement and that annual affirmative consent requirements have to be promulgated as a rule under the Administrative Procedures Act (APA), MCL 24.201 et seq.; MSA 3.560(101) et seq.

The Secretary of State adopted emergency rules pursuant to § 48 of the APA to mandate the same requirements that were preliminarily enjoined. The plaintiffs moved for a preliminary injunction against the enforcement of the emergency rules. The court granted the requested preliminary injunction, determining that no emergency had existed, that the emergency rules were not supported by the express language of § 55(6), that the plaintiffs would be irrepa-

rably harmed if the injunction was not issued, that issuing the injunction would maintain the status quo and thus would not cause harm to the Secretary of State, and that the injunction was in the public interest. The Secretary of State and the Chamber of Commerce appealed by leave granted, and their appeals were consolidated.

The Court of Appeals *held*:

The trial court did not abuse its discretion in preliminarily enjoining the enforcement of the emergency rules.

1. The emergency rules are presumptively valid inasmuch as they are within the subject matter of the MCFA, they comply with the legislative intent underlying the MCFA, and they are not arbitrary or capricious. The trial court therefore misjudged the strength of the plaintiffs' demonstration that they are likely to prevail on the merits of their claim for declaratory relief that the emergency rules are substantively invalid. However, if and when this matter comes to trial, the actual determination of this claim is for the trial court in the first instance.

2. The emergency rules are procedurally invalid. The basis for the finding of emergency was the trial court's injunction against enforcement of the declaratory ruling and interpretative statement. However, because that injunction applied to enforcement against Michigan State AFL-CIO and its affiliates only, the welfare of the public at large was unaffected. No emergency affecting the public existed, inasmuch as the Secretary of State remained free to enforce its declaratory ruling and interpretative statement against other organizations.

Affirmed.

O'CONNELL, J., concurring in part and dissenting in part, agreed with the majority's conclusions that the plaintiffs will not prevail on the merits of their claim and that the emergency rules are substantively valid, but disagreed with the majority's conclusion that the emergency rules are procedurally invalid for lack of the requisite emergency. The Legislature delegated the power to determine that an emergency exists for purposes of § 48 of the APA to the Governor and inferior executive officers, and the constitutional doctrine of separation of powers precludes the judiciary from overseeing or second-guessing such finding of emergency. Moreover, the plaintiffs' action should have been dismissed on the basis of their failure to exhaust administrative remedies afforded by the MCFA.

1. INJUNCTIONS — PRELIMINARY INJUNCTIONS.

A court, in determining whether to issue a preliminary injunction, must consider harm to the public interest if the injunction issues,

whether harm to the applicant in the absence of temporary relief outweighs the harm to the opposing party if relief is granted, the likelihood that the applicant will prevail on the merits, and a demonstration that the applicant will suffer irreparable injury if the relief is not granted; other considerations are whether a preliminary injunction will preserve the status quo so that a final hearing can be held without either party having been injured and whether it will grant one of the parties final relief before a hearing on the merits; the court's decision must not be arbitrary and must be based on the facts of the particular case.

2. ADMINISTRATIVE LAW — ADMINISTRATIVE PROCEDURES ACT — EMERGENCY RULES.

Emergency rules adopted by an administrative agency in accordance with the Administrative Procedures Act are legislative rules that have the force and effect of law (MCL 24.248; MSA 3.560[148]).

3. ADMINISTRATIVE LAW — RULES — SUBSTANTIVE VALIDITY.

The validity of a rule adopted by an administrative agency is determined by a three-part test: whether the rule is within the subject matter of the enabling statute; whether it complies with the legislative intent underlying the enabling statute; and whether it is arbitrary or capricious (MCL 24.201 *et seq.*; MSA 3.560[101] *et seq.*).

4. ADMINISTRATIVE LAW — EMERGENCY RULES.

An emergency rule must satisfy three conditions: the agency adopting the rule has to find that preservation of the public health, safety, or welfare requires promulgation of an emergency rule without following the notice-and-participation procedures required by §§ 41 and 42 of the Administrative Procedures Act; the agency must state in the rule the reasons for its finding of emergency, and the Governor must concur in the finding of emergency (MCL 24.248[1]; MSA 3.560[148][1]).

5. ADMINISTRATIVE LAW — EMERGENCY RULES — PRESERVATION OF PUBLIC WELFARE.

"Public welfare," for purposes of the adoption under the Administrative Procedures Act of an emergency rule deemed necessary for the preservation of public welfare, means the prosperity, wellbeing, or convenience of the public at large, or of a whole community, as distinguished from the advantage of an individual or limited class (MCL 24.248; MSA 3.560[148]).

*Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Andrew Nickelhoff*), for Michigan State AFL-CIO and Franklin D. Garrison.

*White, Przybylowicz, Schneider & Baird, P.C.* (by *Thomas A. Baird*), for Michigan Education Association.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Gary P. Gordon* and *Katherine C. Galvin*, Assistant Attorneys General, for Secretary of State.

*Honigman Miller Schwartz and Cohn* (by *John D. Pirich* and *Timothy Sawyer Knowlton*), for Michigan Chamber of Commerce.

Before: MCDONALD, P.J., and O'CONNELL and SMOLENSKI, JJ.

SMOLENSKI, J. In these consolidated interlocutory appeals, defendant Secretary of State and intervening defendant Michigan Chamber of Commerce appeal by leave granted a September 24, 1997, preliminary injunction enjoining the secretary from enforcing emergency rules. We affirm.

This case concerns a preenforcement challenge to the validity of emergency rules promulgated by the secretary. This case arises out of the secretary's efforts to implement the annual affirmative consent requirement contained in § 55(6) of the Michigan Campaign Finance Act (MCFA), MCL 169.201 *et seq.*; MSA 4.1703(1) *et seq.* Specifically, § 55(6) provides that certain entities, including labor organizations, may solicit or obtain contributions for a separate segregated fund on an automatic basis, including a payroll deduction plan, "only if the individual who is contributing to the fund affirmatively consents to the contribution at least once in every calendar year." See

MCL 169.255(6); MSA 4.1703(55)(6).[1] A person who knowingly violates § 55(6) is guilty of a felony punishable by either a fine or up to three years' imprisonment. MCL 169.255(7); MSA 4.1703(55)(7).

The MCFA requires the secretary to "[p]romulgate rules and issue declaratory rulings[2] to implement this act" pursuant to the Administrative Procedures Act (APA), MCL 24.201 *et seq.*; MSA 3.560(101) *et seq.* See MCL 169.215(1)(e); MSA 4.1703(15)(1)(e). The MCFA also provides that when a person requests a declaratory ruling, the secretary "may issue an interpretative statement providing an informational response to the question presented." MCL 169.215(2); MSA 4.1703(15)(2). Finally, the MCFA provides that

---

[1] Specifically, § 55(6) provides as follows:

Contributions shall not be obtained for a separate segregated fund established under this section by use of coercion or physical force, by making a contribution a condition of employment or membership, or by using or threatening to use job discrimination or financial reprisals. A corporation organized on a for profit or nonprofit basis, a joint stock company, a domestic dependent sovereign, or a labor organization shall not solicit or obtain contributions for a separate segregated fund established under this section from an individual described in subsection (2) , (3), (4), or (5) on an automatic or passive basis including but not limited to a payroll deduction plan or reverse checkoff method. A corporation organized on a for profit or nonprofit basis, a joint stock company, a domestic dependent sovereign, or a labor organization may solicit or obtain contributions for a separate segregated fund established under this section from an individual described in subsection (2), (3), (4), or (5) on an automatic basis, including but not limited to a payroll deduction plan, only if the individual who is contributing to the fund affirmatively consents to the contribution at least once in every calendar year. [MCL 169.255(6); MSA 4.1703(55)(6).]

[2] Unlike rules, "[a] declaratory ruling is binding on the agency and the person requesting it unless it is altered or set aside by any court." MCL 24.263; MSA 3.560(163).

[a] declaratory ruling or interpretative statement issued under this section shall not state a general rule of law, other than that which is stated in this act, until the general rule of law is promulgated by the secretary of state as a rule pursuant to the [APA], or pursuant to judicial order. [MCL 169.215(2); MSA 4.1703(15)(2).]

Ordinarily, agencies must follow the notice-and-participation rule-making procedures contained in the APA. *Blank v Dep't of Corrections*, 222 Mich App 385, 392; 564 NW2d 130 (1997). However, § 48 of the APA provides for the promulgation of emergency rules:

(1) If an agency finds that preservation of the public health, safety, or welfare requires promulgation of an emergency rule without following the notice and participation procedures required by sections 41 and 42 and states in the rule the agency's reasons for that finding, and the governor concurs in the finding of emergency, the agency may dispense with all or part of the procedures and file in the office of the secretary of state the copies prescribed by section 46 indorsed as an emergency rule, to 3 of which copies shall be attached the certificates prescribed by section 45 and the governor's certificate concurring in the finding of emergency. The emergency rule is effective on filing and remains in effect until a date fixed in the rule or 6 months after the date of its filing, whichever is earlier. The rule may be extended once for not more than 6 months by the filing of a governor's certificate of the need for the extension with the office of the secretary of state before expiration of the emergency rule. An emergency rule shall not be numbered and shall not be compiled in the Michigan administrative code, but shall be noted in the annual supplement to the code. The emergency rule shall be published in the Michigan register pursuant to section 8.

(2) If the agency desires to promulgate an identical or similar rule with an effectiveness beyond the final effective date of an emergency rule, the agency shall comply with the procedures prescribed by this act for the processing of a

rule which is not an emergency rule. The rule shall be published in the Michigan register and in the code.

(3) The legislature by a concurrent resolution may rescind an emergency rule promulgated pursuant to this section. [MCL 24.248; MSA 3.560(148).]

In this case, the Chamber of Commerce, through its general counsel, Robert S. LaBrant, submitted to the secretary a request for a declaratory ruling and interpretative statement in April 1997.[3] The request for a declaratory ruling sought answers to questions concerning what constituted annual affirmative consent for purposes of § 55(6). The request for an interpreta-

---

[3] The annual affirmative consent requirement was added by 1994 PA 117 and scheduled to take effect on April 1, 1995. However, because of proceedings in federal court, enforcement of the annual affirmative consent requirement was enjoined from March 31, 1995, until, as represented by the parties on appeal, May 19, 1997.

Specifically, on February 14, 1995, certain plaintiffs, including the instant plaintiffs Michigan State AFL-CIO and its president, Franklin D. Garrison, filed a complaint for declaratory and injunctive relief in federal district court against, among others, the secretary. See *Michigan State AFL-CIO v Miller*, 103 F3d 1240, 1244 (CA 6, 1997). The complaint contended that various sections of the MCFA, including the annual affirmative consent requirement, were unconstitutional. *Id.* at 1244, 1249-1253. On March 31, 1995, the district court issued an opinion holding that various sections of the MCFA were unconstitutional. *Id.* at 1244. In particular, the district court held that the annual affirmative consent requirement violated the First Amendment. *Id.* at 1253. The district court granted a preliminary injunction enjoining the enforcement of various sections of the MCFA, including the annual affirmative consent requirement. *Id.* at 1244. The secretary appealed the district court's grant of a preliminary injunction with respect to the annual affirmative consent requirement. *Id.* at 1244. On January 7, 1997, the federal appeals court reversed the district court's holding that the annual affirmative consent requirement violated the First Amendment and vacated the preliminary injunction to the extent that it enjoined the enforcement of this requirement. *Id.* at 1253. On March 19, 1997, the appeals court denied a rehearing. *Id.* at 1240. Although we find nothing in the record to support this contention, the parties on appeal represent that enforcement of the annual affirmative consent requirement was further enjoined until May 19, 1997, when the federal appeals court issued a mandate vacating the preliminary injunction.

tive statement sought answers to questions concerning the applicability of the annual affirmative consent requirement to certain contributions and elections.

On July, 11, 1997, the secretary issued the requested declaratory ruling and interpretative statement. The declaratory ruling outlined the secretary's interpretation of what constituted annual affirmative consent for purposes of § 55(6). In particular, the declaratory ruling provided that beginning July 20, 1997, affirmative consent was required to be evidenced by a writing signed by the contributor (the signed writing requirement) and would be effective only until the end of the calendar year for which it was given (the December 31 expiration requirement). On both July 11 and 14, 1997, the secretary issued memorandums summarizing how separate segregated funds obtaining contributions on an automatic basis, including payroll deduction plans, would be affected by the declaratory ruling.

On July 31, 1997, plaintiffs Michigan State AFL-CIO and its president, Franklin D. Garrison (collectively referred to as the union), filed a complaint in the Ingham Circuit Court against the secretary. The complaint contained three counts and was entitled "Verified Complaint For Declaratory Judgment And Injunction And/Or Petition For Review." In count one, the union asserted that the secretary's declaratory ruling concerning the requirements for annual affirmative consent, particularly the signed writing and December 31 expiration requirements, constituted "a general rule of law, other than that which is stated in the [MCFA]" and therefore was required by § 15(2) of the MCFA to be promulgated by the secretary as rules pursuant to the APA. The union requested that the circuit

court enter a declaratory judgment that the declaratory ruling and interpretative statement was "invalid and without effect." The union also sought preliminary and permanent injunctions enjoining the secretary from enforcing the declaratory ruling and interpretative statement against the political committees of the union and other labor organizations. In count two, the union sought judicial review of the declaratory ruling and interpretative statement for the reasons asserted in count one. Count two also requested declaratory and injunctive relief. Count three challenged certain actions taken by the secretary with respect to the affiliation requirements contained in § 52(10) of the MCFA, MCL 169.252(10); MSA 4.1703(52)(10).

On August 26, 1997, the chamber was permitted to intervene in this action as a defendant. Following oral argument on August 28, 1997, the circuit court issued a preliminary injunction that, in relevant part, enjoined the secretary from applying the declaratory ruling and interpretative statement to the "Plaintiff Michigan State AFL-CIO and its political committee and its affiliated organizations and their political committees." In so doing, the court noted that the express language of § 55(6) did not include either a signed writing or December 31 expiration requirement. The court also suggested that the secretary's interpretation of the annual affirmative consent requirements had to be promulgated as a rule under the APA.[4]

---

[4] The secretary, on August 29, 1997, and the chamber, on September 3, 1997, applied for leave to appeal the August 28, 1997, preliminary injunction. This Court denied leave to appeal. *AFL-CIO v Secretary of State*, unpublished orders of the Court of Appeals, entered September 9, 1997 (Docket Nos. 205745, 205821).

That same day, the secretary filed the following emergency rules pursuant to § 48 of the APA:

FINDING OF EMERGENCY

Act No. 117 of the Public Acts of 1994 amended the Michigan campaign finance act, Act No. 388 of the Public Acts of 1976, as amended, being § 169.201 et seq. of the Michigan Compiled Laws, to prohibit corporations, joint stock companies, domestic dependent sovereign and labor organizations from soliciting or obtaining contributions for separate segregated funds from certain individuals on an automatic or passive basis including but not limited to payroll deductions or reverse checkoffs. The amendment permits contributions to be solicited or obtained on an automatic basis, including but not limited to payroll deductions, only if the contributing individual affirmatively consents to the contribution at least once in every calendar year.

In a declaratory ruling dated July 11, 1997, issued to Robert S. LaBrant, the secretary of state construed the Michigan campaign finance act to mean that the affirmative consent must be in writing and that the consent is effective only through December 31 of the year for which it is given.

In the case of *Michigan State AFL-CIO and Franklin D. Garrison v Candice Miller*, Case No. 97-86692 AZ, the Ingham county circuit court preliminarily enjoined the enforcement of the July 11, 1997 declaratory ruling because of the absence of administrative rules.

Therefore, the promulgation of administrative rules requiring written affirmative consent and establishing the effective length of that consent will eliminate this issue and will enable the policy of the state of Michigan, as embodied in Act No. 117 of the Public Acts of 1994, to be effectuated. The permanent rule-making process will take several months to complete. That delay could allow political contributions to be made in contravention of the current policy of the state of Michigan.

The governor has indicated that an injunction which frustrates state policy adversely affects the public welfare and justifies the promulgation of emergency rules under section 48 of Act No. 306 of the Public Acts of 1969, as amended,

being §24.248 of the Michigan Compiled Laws. The department of state finds that preservation of the public welfare requires the promulgation of these emergency rules.
Definitions.

Rule 1. (1) As used in these rules, "act" means Act No. 388 of the Public Acts of 1976, as amended being § 169.201 *et seq.* of the Michigan Compiled Laws.

(2) Unless the context requires otherwise, a term defined in the act has the same meaning when used in these rules.
Affirmative consent; effectiveness.

Rule 2. The affirmative consent required by section 55(6) of the act shall be effective only through December 31 of the year for which it is given.
Affirmative consent; form.

Rule 3. The affirmative consent required by section 55(6) of the act shall be given in writing in substantially the following form:

AFFIRMATIVE CONSENT TO POLITICAL CONTRIBUTION

Section 55(6) of the Michigan Campaign Finance Act provides that a corporation, a joint stock company, a domestic dependent sovereign, or a labor organization "may solicit or obtain contributions for a separate segregated fund established on an automatic basis, including but not limited to a payroll deduction plan, only if the individual who is contributing to the fund affirmatively consents to the contribution at least once in every calendar year."

I, _____, authorize _____
First Name, Middle Name, Last Name,     Name of Employer
to withhold $ _____ per: pay period/week/month from
Circle one
my earnings in order to make political contributions to

_____ .
Name of Committee
This consent is for calendar year [     ].

Signature: _____ Date: _____

On September 4, 1997, the union moved for a preliminary injunction to enjoin enforcement or applica-

tion of the emergency rules. The union argued that it was likely to prevail on the merits of its claim that the emergency rules were invalid, in part, because (1) no genuine emergency existed and the emergency rules were simply promulgated under § 48 of the APA in order to "evade and neutralize" the court's August 28, 1997, preliminary injunction, and (2) the signed writing and December 31 expiration rules exceeded the language and intent of the MCFA and were unreasonable, arbitrary, and unduly restrictive on political entities regulated by the MCFA. The union also contended that if a preliminary injunction were not issued, it would suffer irreparable injury, and that if a preliminary injunction were issued, the secretary would suffer no harm while the public interest would be served. In response, defendants contended that the emergency rules were valid.

Following oral argument on September 24, 1997, the trial court granted a preliminary injunction ordering the secretary,

> her officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and are hereby enjoined, pending further order of the Court, from applying, enforcing, publicizing or otherwise putting into effect the emergency rules promulgated on August 28, 1997.

In so doing, the court concluded that no emergency had existed. The court reasoned that the secretary had had "plenty of time" and "years" to promulgate rules pursuant to the general notice-and-participation procedures contained in the APA. When the secretary's counsel contended that the August 28, 1997, preliminary injunction—which enjoined the enforcement of

the declaratory ruling only with respect to the political committees of the union and its affiliated organizations but not the chamber or other entities—created an unequal enforcement scheme that constituted an emergency, the court expressed amazement that this argument could even be made where the secretary's counsel had participated in negotiating and drafting the August 28, 1997, preliminary injunction.

The court also concluded that the emergency rules, like the declaratory ruling, exceeded the statutory language contained in § 55(6) of the MCFA. The court reasoned that the union would be irreparably injured if a preliminary injunction did not issue in light of the criminal penalties for violation of § 55(6). The court reasoned that issuing a preliminary injunction would maintain the status quo and therefore cause the secretary no harm. Finally, the court reasoned that issuing a preliminary injunction was in the public interest.

On October 14, 1997, this Court entered orders granting defendants' applications for leave to appeal the September 24, 1997, preliminary injunction, denying defendants' motions for a stay of this preliminary injunction, and consolidating defendants' appeals. On November 17, 1997, the union filed a first supplemental complaint pursuant to a stipulation of the parties. The supplemental complaint reiterated the original complaint's first three counts and added a fourth count that challenged the validity of the secretary's emergency rules and requested declaratory and injunctive relief.

On appeal, the secretary and the chamber contend that the trial court erred in granting the Union's request to preliminarily enjoin enforcement of the emergency rules.

As explained in *Thermatool Corp v Borzym*, 227 Mich App 366, 376; 575 NW2d 334 (1998):

> In determining whether to issue a preliminary injunction, a court must consider four factors: (1) harm to the public interest if the injunction issues; (2) whether harm to the applicant in the absence of temporary relief outweighs the harm to the opposing party if relief is granted; (3) the likelihood that the applicant will prevail on the merits; and (4) a demonstration that the applicant will suffer irreparable injury if the relief is not granted. Other considerations surrounding the issuance of a preliminary injunction are whether it will preserve the status quo so that a final hearing can be held without either party having been injured and whether it will grant one of the parties final relief prior to a hearing on the merits. The trial court's decision must not be arbitrary and must be based on the facts of the particular case. [Citations omitted.]

A trial court's decision to grant injunctive relief is reviewed under an abuse of discretion standard.

The secretary and the chamber primarily challenge the trial court's determination with regard to factor 3. They contend that the trial court erred in determining that the union is likely to prevail on the merits of its claim for declaratory relief that the emergency rules are invalid. We initially note that the parties disagree concerning the legal status of the emergency rules. The secretary and the chamber contend that the emergency rules are legislative rules that have the force and effect of law. See *Clonlara v State Bd of Ed*, 442 Mich 230, 239-240; 501 NW2d 88 (1993). The union contends that the emergency rules are simply nonbinding interpretative rules. *Id.* We agree with the secretary and the chamber. The MCFA requires the secretary to promulgate rules pursuant to the APA. Rules adopted by an agency in accordance with the APA are

legislative rules that have the force and effect of law. *Clonlara, supra.* In this case, the secretary adopted the emergency rules pursuant to § 48 of the APA. We conclude that the emergency rules are legislative rules that, if valid, have the force and effect of law.

The applicable test for determining the substantive validity of an agency's legislative rules is as follows:

> "Where as here, an agency is empowered to make rules, the validity of those rules is to be determined by a three-part test: (1) whether the rule is within the subject matter of the enabling statute; (2) whether it complies with the legislative intent underlying the enabling statute; and (3) whether it is arbitrary or capricious." [*Blank, supra* at 406, quoting *Dykstra v Dep't of Natural Resources*, 198 Mich App 482, 484; 499 NW2d 367 (1993), citing *Luttrell v Dep't of Corrections*, 421 Mich 93, 100; 365 NW2d 74 (1984).]

In *Thomas Bros, Inc v Secretary of State*, 90 Mich App 179, 185-186; 282 NW2d 273 (1979), after remand 107 Mich App 805; 310 NW2d 249 (1984), this Court utilized the three-part test stated in *Blank* to determine the substantive validity of emergency rules.

In this case, the enabling statute, § 15(1)(e) of the MCFA, specifically requires the secretary to promulgate rules under the APA for the purpose of implementing the MCFA. See MCL 169.215(1)(e); MSA 4.1703(15)(1)(e). The MCFA regulates campaign financing and contributions, including contributions to separate segregated funds and the manner in which certain entities can obtain automatic contributions for such funds. See, e.g., MCL 169.252; MSA 4.1703(52) and MCL 169.255; MSA 4.1703(55). The MCFA also contains reporting requirements and requires the secretary to develop a system for filing such reports. See, e.g., MCL 169.215(1)(b); MSA 4.1703(15)(1)(b) and

MCL 169.224; MSA 4.1703(24). It thus appears that the secretary's emergency rules are within the subject matter covered by the enabling statute.

Second, the rules must comply with the legislative intent underlying the enabling statute. In this case, § 55(6) of the MCFA provides that a labor organization may obtain contributions for a separate segregated fund on an automatic basis "only if the individual who is contributing to the fund affirmatively consents to the contribution at least once in every calendar year." It is true that § 55(6) does not specifically prescribe the form or expiration date for annual affirmative consent. However, the plain language of the enabling statute, § 15(1)(e) of the MCFA, "not only defines its scope and reveals its subject matter, but also manifests the legislative intent behind it." *Blank*, *supra* at 406. "It is clear from the general language used that the Legislature was aware of the great responsibility" placed on the secretary and intended to vest the secretary with wide discretion to implement and enforce the provisions of the MCFA. *Id.* It thus appears that promulgating rules that specify the form and expiration date for annual affirmative consent is consistent with the legislative intent underlying the enabling statute.

Finally, the rules must not be arbitrary or capricious. As explained in *Blank*, *supra* at 407 (citations omitted):

> A rule is arbitrary if it was fixed or arrived at through an exercise of will or by caprice, without giving consideration to principles, circumstances, or significance. A rule is capricious if it is apt to change suddenly or is freakish or whimsical. If a rule is rationally related to the purposes of the statute, it is neither arbitrary nor capricious. Further, if

there is any doubt about the invalidity of a rule in this regard, the rule must be upheld.

It thus appears that the emergency rules, which specify the form and expiration date for annual affirmative consent, are rationally related to the requirement of annual affirmative consent for automatic contributions to separate segregated funds. The rules are presumed valid and no argument has been presented that persuades us that the challenged rules are substantively invalid. *Id.*

Accordingly, for purpose only of our preliminary injunction analysis, we conclude that the trial court apparently misjudged the strength of the union's demonstration that it is likely to prevail on the merits of its claim for declaratory relief that the secretary's emergency rules are substantively invalid. However, we emphasize that if and when this matter comes to trial, the actual determination of this claim is for the trial court in the first instance.

Next, the secretary and the chamber contend that the trial court erred in determining that no emergency existed.

In *Michigan Petroleum Ass'n v State Fire Safety Bd*, 124 Mich App 187; 333 NW2d 506 (1983), the State Fire Safety Board adopted proposed rules to establish hazardous-material inspection fees and, as required by the APA, submitted these rules for approval by the Legislature's Joint Committee on Administrative Rules (JCAR).[5] *Id.* at 189. When the JCAR reported that it had reached an impasse concerning the board's proposed

---

[5] In *Blank, supra,* this Court held that the APA was unconstitutional to the extent that it required the JCAR to approve proposed administrative rules.

rules, the board adopted emergency rules substantially similar to the original proposed rules pursuant to the following finding of emergency:

"Fees were established by the State Fire Safety Board after a time and cost study and were processed through the regular rule promulgation procedures established by [the APA]. These rules received an impasse certification from the joint committee on administrative rules. Without the funds which these rules will generate, the department will not be able to perform inspections of hazardous materials vehicles and facilities and will not be able to respond to assist local agencies with the handling of incidents, the result being a threat to the safety of the people of the state." [*Id.* at 189-190.]

The plaintiffs filed a complaint for declaratory relief in the circuit court, contending that the emergency rules were invalid, in part, because no emergency had existed. *Id.* at 188-190. The trial court disagreed and found that the emergency rules were validly enacted. *Id.* at 189. The plaintiffs appealed. *Id.*

This Court affirmed. *Id.* at 194. In response to the plaintiffs' argument that no emergency had existed to justify the issuance of the rules, this Court stated as follows, *id.* at 193-194:

In holding that the board had a substantial basis for enacting emergency hazardous material inspection fee rules, the trial court reasoned:

"Plaintiffs argue that the board's finding of emergency was 'merely a statement of motivation' and that the finding did not 'reflect a crisis situation emergent or actual.' They note that the Legislature created the inspection program and the Legislature, through its committee, held up the promulgation of the rules through its certification of an impasse. It is argued this adds credence to the position that no crisis situation existed. As previously noted, however,

the APA scheme is that the agency first determines whether
'the preservation of public health, safety and welfare
requires promulgation of an emergency rule,' and if the Leg-
islature is of the position that an emergency situation does
not exist, it may rescind the emergency rules by concurrent
resolution."

"Based on the record, this court cannot hold that the
board lacked substantial basis for its finding that the public
interest required promulgation of the Hazardous Materials
Inspection Fees Emergency Rules for the 1979-1980 fiscal
year. The inspection and certification program grew out of
the passage of 1978 PA 3, amending the Fire Prevention Act,
and provided for annual inspections and annual certifica-
tions of tank vehicles and storage locations. Inspection fees
are authorized and must be paid annually to the fire mar-
shal before the issuance of a certificate. The amount of fees
was left to be determined by the board."

We are in agreement with the trial court's foregoing anal-
ysis. Furthermore, we do not find that the board abused its
rule-making authority.[9]

---

[9] For the standard applied by appellate courts in reviewing deci-
sions rendered by administrative bodies, see *Mississippi Valley
Barge Line Co v United States*, 292 US 282, 286-287; 54 S Ct 692; 78
L Ed 1260 (1934); *Coffman v State Bd of Examiners in Optometry*,
331 Mich 582, 587-591; 50 NW2d 322 (1951). See, generally, Davis,
Administrative Law Text (3d ed), §§ 29.01-29.02, pp 525-530.

---

Thus, it appears that the test adopted by *Michigan
Petroleum* "was whether the adopting agency 'lacked
a substantial basis for its finding that the public inter-
est required promulgation' of the emergency rule."
LeDuc, Michigan Administrative Law, § 4:37, ch 4, p
58. "The opinion also seemed to include an abuse of
discretion aspect to the test." LeDuc, *supra*.

However, the "substantial basis" test used in *Michi-
gan Petroleum* is not supported by any citation of
authority. The "substantial basis" test does evoke the

"competent, material and substantial" evidence test used by reviewing courts. See Const 1963, art 6, § 28; MCL 24.306(d); MSA 3.560(206)(d). However, the "competent, material and substantial" evidence test is used by the courts for the purpose of reviewing judicial or quasi-judicial factual findings by an agency following a hearing. See Const 1963, art 6, § 28; MCL 24.271; MSA 3.560(171), MCL 24.301; MSA 3.560(201), MCL 24.306(d); MSA 3.560(206)(d). For the purpose of § 48 of the APA, an agency's finding of emergency is not made after a hearing and, made as it is in the context of rule-making, is quasi-legislative in nature. Moreover, the cases cited by *Michigan Petroleum* as authority for including an abuse of discretion aspect to the test for emergency are distinguishable. Specifically, *Coffman* applied the abuse of discretion test in the context of the review of the substantive validity of a rule.[6] *Mississippi Valley*, to the extent it even applies an abuse of discretion test, concerns the review of factual findings in a rate-making case. Thus, we are not convinced that the "substantial basis" or "abuse of discretion" tests are the appropriate tests.

We therefore turn to a consideration of the nature of and policies underlying the APA. The APA is not substantive. LeDuc, § 1:10, ch 1, p 14. Rather, the APA contains complex procedures governing, among other things, the development of rules. LeDuc, *supra*; see also *Blank, supra* at 402. As further explained by our Supreme Court:

---

[6] We also note that after *Coffman* was decided, our Supreme Court subsequently adopted in *Luttrell* the three-part test we apply today to determine the substantive validity of the emergency rules.

"[B]ecause the adoption of a rule by an agency has the force and effect of law and may have serious consequences for many people, the legislature prescribed an elaborate procedure for rule promulgation in Chapter 3 of the Michigan Administrative Procedures Act . . . . These provisions are calculated to invite public participation in the rule-making process, prevent precipitous action by the agency, prevent the adoption of rules that are illegal or that may be beyond the legislative intent, notify affected and interested persons of the existence of the rules and make the rules readily accessible after adoption." [*Detroit Base Coalition For The Human Rights Of The Handicapped v Dep't of Social Services*, 431 Mich 172, 189-190; 428 NW2d 335 (1988) (quoting Bienenfeld, Michigan Administrative Law, p 4-1).]

However, under § 48 of the APA, an agency can "short-cut" the notice and hearing provisions when there is "justification for the use of the emergency rulemaking procedures . . . ." LeDuc, § 4:37 and § 4:43. In this case, the trial court determined that there was no emergency to justify the filing of the emergency rules. Thus, we construe the secretary's and the chamber's argument to be that the trial court erred in determining that the emergency rules were procedurally invalid.

An emergency rule is justified if three conditions are satisfied: (1) the agency "finds that preservation of the public health, safety, or welfare requires promulgation of an emergency rule without following the notice and participation procedures required by section 41 and 42;" (2) the agency "states in the rule the agency's reasons for that finding"; and (3) "the governor concurs in the finding of emergency." MCL 24.248(1); MSA 3.560(148)(1). In this case, we consider only the first two conditions. In so considering, we are mindful that rules have the force and effect of

law and may have serious consequences for many people. *Detroit Base Coalition, supra* at 189. We therefore examine the substantive meaning of the phrase "preservation of the public health, safety, or welfare" in order to determine exactly the standard or threshold intended by the Legislature before an agency can "short-cut" the general rule-making procedural protections intended by the APA.

Black's Law Dictionary (6th ed) defines "public welfare" as follows:

> The prosperity, well-being, or convenience of the public at large, or of a whole community, as distinguished from the advantage of an individual or limited class. It embraces the primary social interests of safety, order, morals, economic interest, and non-material and political interests. In the development of our civic life, the definition of "public welfare" has also developed until it has been held to bring within its purview regulations for the promotion of economic welfare and public convenience.

Thus, in order to bypass the general rule-making procedural protections contained in the APA, the secretary in this case was required to find that the preservation of the political interests "of the public at large, or of a whole community, as distinguished from the advantage of an individual or limited class" required promulgation of an emergency rule.

With this substantive standard in mind, we turn to the relevant portion of the secretary's finding of emergency:

> In a declaratory ruling dated July 11, 1997, issued to Robert S. LaBrant, the secretary of state construed the Michigan campaign finance act to mean that the affirmative consent must be in writing and that the consent is effective only through December 31 of the year for which it is given.

In the case of *Michigan State AFL-CIO and Franklin D. Garrison v Candice Miller*, Case No. 97-86692 AZ, the Ingham county circuit court preliminarily enjoined the enforcement of the July 11, 1997 declaratory ruling because of the absence of administrative rules.

Therefore, the promulgation of administrative rules requiring written affirmative consent and establishing the effective length of that consent will eliminate this issue and will enable the policy of the state of Michigan, as embodied in Act No. 117 of the Public Acts of 1994, to be effectuated. The permanent rule-making process will take several months to complete. That delay could allow political contributions to be made in contravention of the current policy of the state of Michigan.

The governor has indicated that an injunction which frustrates state policy adversely affects the public welfare and justifies the promulgation of emergency rules under section 48 of Act No. 306 of the Public Acts of 1969, as amended, being §24.248 of the Michigan Compiled Laws. The department of state finds that preservation of the public welfare requires the promulgation of these emergency rules.

Thus, the basis for the secretary's finding of emergency was the August 28, 1997, injunction that enjoined the enforcement of the secretary's declaratory ruling. However, the August 28, 1997, injunction only enjoined the secretary from enforcing the declaratory ruling against the political committees of the union and its affiliated organizations. As recognized by the secretary in its "unequal enforcement" argument, the secretary was not prohibited during this litigation from attempting to enforce its interpretation of § 55(6) of the MCFA, as expressed in the declaratory ruling, against all other entities subject to this statute. In *Michigan Petroleum*, the preservation of the safety of the whole community was threatened by the agency's inability to conduct any hazardous-materials inspections because of a lack of funding. However,

we fail to perceive how preservation of the political interests of the whole community is threatened where the secretary is generally free to attempt to enforce its interpretation of § 55(6) of the MCFA except against the limited class of the political committees of the union and its affiliated organizations. It thus appears that the secretary's finding does not meet the statutory substantive standard of "preservation of the public . . . welfare," i.e., of the "public at large, or of a whole community." Rather, it appears that the secretary's finding relates only to "the advantage of a[] . . . limited class."

A rule is invalid and may be stricken by a court if the agency failed to follow proper procedure. *Clonlara, supra* at 240; *Detroit Base Coalition, supra* at 183; *Blank, supra*. Generally, this principle applies where the agency fails to promulgate a rule in accordance with the APA's notice-and-participation procedures. However, we see no reason why this principle should not apply to emergency rules should the agency fail to follow the procedures and standards enunciated in § 48 of the APA, particularly where these procedures and standards take the place of the general rule-making procedural protections contained in the APA. It thus appears that the secretary's emergency rules are procedurally invalid because the secretary's finding did not meet the statutory threshold imposed by the Legislature. We note that we have treated this issue as an issue of statutory construction, which is a question of law that we review de novo. *Dickerson v Raphael*, 222 Mich App 185, 190; 564 NW2d 85 (1997). However, we would arrive at the same conclusion even if the "substantial basis" and

"abuse of discretion" tests enunciated in *Michigan Petroleum* are the appropriate tests.

We conclude, therefore, albeit for different reasons, that the trial court did not err in determining that the union is likely to prevail on the merits of its claim for declaratory relief that the emergency rules are procedurally invalid.

We have considered the secretary's remaining challenges to the trial court's grant of the September 24, 1997, preliminary injunction and find them to be without merit.

In summary, we conclude that the trial court apparently misjudged the strength of the union's demonstration that it is likely to prevail on the merits of its claim for declaratory relief that the secretary's emergency rules are substantively invalid. However, we conclude that the trial court did not err in determining that the union is likely to prevail on the merits of its claim for declaratory relief that the emergency rules are procedurally invalid. No persuasive arguments have been made that the trial court erred in its consideration of the other preliminary injunction factors, and we will not, therefore, second-guess the trial court in this regard. The grant of a preliminary injunction with respect to the emergency rules preserved the status quo pending a final hearing and did not grant any of the parties final relief before a hearing on the merits. *Thermatool, supra* at 376. Accordingly, we conclude that on the facts of this particular case the trial court did not abuse its discretion in preliminarily enjoining the enforcement of the emergency rules.

Affirmed.

MCDONALD, P.J., concurred.

O'CONNELL, J. (*concurring in part and dissenting in part*). I concur with the majority's well-reasoned conclusion that the union will not prevail on the merits of this claim. I also agree with the majority's conclusion that the Secretary of State's emergency rules are substantively valid. For these reasons, I conclude that the lower court should not have issued injunctions against enforcement of the Secretary of State's declaratory rulings or properly promulgated emergency rules.

I respectfully dissent from the majority's conclusion that the emergency rules are procedurally invalid for lack of the prerequisite emergency. In so holding, the majority places its stamp of approval on a process that allows one of the largest political fundraising organizations in the state of Michigan, outside the major political parties, to ignore the law and operate by separate rules during an ongoing election cycle. This situation, in my view, is no different from allowing candidates favored by the AFL-CIO to stuff ballot boxes[1] while those supported by the Michigan Chamber of Commerce could not, or vice versa. The circuit court, by its rash issuance of a preliminary injunction that threatens irrevocably to skew the political process, vividly demonstrates why the people confided the duty to preserve the purity of elections

---

[1] Whether the ballot boxes are stuffed with improper votes, or honest votes are bought through expenditures of "soft money," the detrimental effect on the fairness of the democratic process is the same. Indeed, the Michigan Campaign Finance Act (MCFA), MCL 169.201 *et seq.*; MSA 4.1703(1) *et seq.*, has been recognized as serving, in this respect, a compelling state interest in protecting the integrity of the electoral process. *Austin v Michigan Chamber of Commerce*, 494 US 652, 660; 110 S Ct 1391; 108 L Ed 2d 652 (1990).

to the legislative, rather than the judicial, branch. The result constitutes a threat to the welfare of the community as a whole, because it represents a direct attack on the entire democratic process.

The primary shortcoming of the majority opinion is its conclusion that the circuit court had jurisdiction to review the determination of the executive branch that an emergency existed. The Legislature has delegated, with appropriate standards, that power to the Governor and has invited neither oversight nor second-guessing by the judiciary. The issuance of a preliminary injunction under these circumstances violates the principle of separation of powers by way of judicial intrusion into an area constitutionally reserved for the other branches of government.

I further observe that the union brought this cause of action to the circuit court in the first instance without having first exhausted available administrative remedies. The court accordingly should have dismissed the case and allowed the administrative process to play itself out. But for this initial error, the instant controversy need not have escalated to involve the promulgation of the emergency rules and related controversies.

## I. INTRODUCTION

This case concerns a facial challenge to the validity of a declaratory ruling by the Secretary of State, and a challenge to emergency rules promulgated by the Secretary of State and approved by the Governor. In early 1997, the Michigan Chamber of Commerce requested a declaratory ruling and interpretative statement concerning the requirements of the Michigan Campaign Finance Act (MCFA), MCL 169.201 *et*

*seq.*; MSA 4.1703(1) *et seq.*, as amended. The requests concerned the timing, manner, and effect of the "affirmative consent" that is required to initiate payroll deductions for campaign contributions under § 55(6) of the MCFA. On July 11, 1997, the Secretary of State issued a final response to the Chamber of Commerce and made the ruling available to the public.

On July 31, 1997, the AFL-CIO brought this action, seeking, inter alia, a preliminary and permanent injunction against the Secretary of State's declaratory ruling. On August 28, 1997, a hearing on the union's request took place in the circuit court. There were no factual disputes, and no testimony was presented. Ruling purely as a matter of law, the court granted the union's motion, preliminarily enjoining the Secretary of State from applying and enforcing the declaratory ruling against "Plaintiff Michigan State AFL-CIO and its political committee and its affiliated organizations and their political committees." Significantly, the August 28 injunction does not apply to any other political organization or labor union in Michigan. The court further held that the Secretary of State could enforce such interpretations of the MCFA only through formal rules promulgated in accordance with the Administrative Procedures Act (APA).

The emergency rules at issue were adopted in response to this latter aspect of the circuit court's holding. The section of the rules entitled "Finding of Emergency" notes that the "governor has indicated that an injunction which frustrates state policy adversely affects the public welfare and justifies the promulgation of emergency rules" and that the "department of state finds that preservation of the public welfare requires [their] promulgation." This

section also states that the delay inherent in utilizing the permanent APA rule-making process "could allow political contributions to be made in contravention of the current policy of the state of Michigan." As required by § 48(1) of the APA, the Governor approved the rules and concurred "in the finding of the Michigan Department of State, that circumstances have created an emergency and the public interest requires the emergency promulgation of the rules pertaining to 'Campaign Financing.' "[2]

On September 4, 1997, the union moved for a temporary restraining order or preliminary injunction to prevent enforcement of the emergency rules. On September 19, 1997, the Secretary of State moved for dismissal of the union's complaint and requested that the August 28, 1997, preliminary injunction be vacated. On September 24, 1997, the circuit court heard arguments. The AFL-CIO argued that the court could review the declaration of emergency and that no emergency existed that would justify the Secretary of State's promulgation of the new rules under MCL 24.248; MSA 3.560(148). The Secretary of State argued that an emergency had been created by the court's previous injunction prohibiting the Secretary of State from enforcing its interpretations regarding § 55(6) of the MCFA against the union. The Secretary of State explained that because the injunction affected only the union, an unequal enforcement scheme had been

---

[2] The proper avenue to dispute the emergency rules is not through the courts but through the process set forth in the applicable legislation, which provides that the "Legislature by a concurrent resolution may rescind an emergency rule promulgated pursuant to this section." MCL 24.248(3); MSA 3.560(148)(3). That a method for checking the appropriateness of a finding of emergency is provided for in the statute by itself suggests that the role of the courts is limited.

created under which the union could exercise undue political influence.

The trial court enjoined the general application of the emergency rules, finding that the harm resulting from its refusal to issue the requested injunction would outweigh any harm resulting from its grant of the injunction, and that the union had a high likelihood of success on the merits of its claim that the rules were in violation of the APA. Because the emergency rules reflected the earlier declarations and interpretations that the trial court had made in conjunction with the August 28, 1997, injunction, the court "adopt[ed] [its] previous comments in this matter and [its] previous ruling." As a result, the concerns underlying the promulgation of emergency rules—namely, the unequal enforcement scheme—again became problematic.

## II. THE EMERGENCY RULES

This is an issue of first impression in Michigan. Since this Court affirmed the finding of an emergency in *Michigan Petroleum Ass'n v State Fire Safety Bd*, 124 Mich App 187; 333 NW2d 506 (1983), it has had no occasion to consider seriously whether review of emergency rules lies within the sphere of judicial competence. However, now that the majority has opined in this case that no emergency has been factually established sufficient to invoke the rule-making powers conferred on the Secretary of State by § 48 of the APA, I believe it necessary to investigate the reasoning by which it purports to make that determination.

Section 48 of the APA requires that any finding of an emergency be endorsed by the Governor before emer-

gency rules can be promulgated. It has long been the rule in this state that when a statute confers such authority upon the Governor, "reasons of a conclusive nature must be presumed to have been found, requiring the particular authority to be confided to the chief executive as one properly and peculiarly, if not exclusively pertaining to the department which he represents." *People ex rel Sutherland v Governor*, 29 Mich 320, 329; 18 Am Rep 89 (1874). Under such circumstances, when a factual question is submitted to the Governor's judgment or discretion, such judgment or discretion cannot be judicially coerced, and the judicial branch is without jurisdiction or authority to review the executive actions of the Governor or the manner in which the Governor fulfills such duties. *Id.* at 322-323. See also *People ex rel Ayres v Bd of State Auditors*, 42 Mich 422, 426; 4 NW 274 (1880) ("we cannot interfere with the discretion of the chief executive of the State or subordinate him to our process").

This conclusion is consistent with the principle of separation of powers, which forms "the fundamental framework of our system of government." *O'Donnell v State Farm Mut Automobile Ins Co*, 404 Mich 524, 541-542; 273 NW2d 829 (1979). As a general rule, the principle recognizes the distinct provinces of the legislative, judicial, and executive branches of government, and mandates that no one branch attempt to "control, direct or restrain the action" of another. *Massachusetts v Mellon*, 262 US 447, 488; 43 S Ct 597; 67 L Ed 1078 (1923). This principle is expressly embedded into our state constitution: "No person exercising powers of one branch shall exercise powers properly belonging to another branch except as

expressly provided in this constitution." Const 1963, art 3, § 2. As our Supreme Court has noted, a purpose of the separation of powers is "to make certain that the judiciary does not substitute its judgment for that of the Legislature as to what is best or what is wisest." *O'Donnell, supra* at 542. This principle is likewise offended when the judiciary attempts to substitute its judgment for that of the executive branch.

Separation of powers principles suggest that a gubernatorial declaration of emergency is conclusive on the judicial branch. See *Moyer v Peabody*, 212 US 78, 83; 29 S Ct 235; 53 L Ed 410 (1909). In *Baker v Carr*, 369 US 186, 217; 82 S Ct 691; 7 L Ed 2d 663 (1962), the United States Supreme Court observed as follows:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Several of these formulations are applicable in the instant case. First, courts are ill-equipped to make

such determinations as the one at issue. See *Idaho State AFL-CIO v Leroy*, 110 Idaho 691, 695; 718 P2d 1129 (1986) ("The decision that a legislative bill is so urgently and immediately needed as to justify a declaration of emergency is a decision-making function that is uniquely legislative. The courts are ill equipped to make such policy decisions."). There is a lack of judicially discoverable and manageable standards for resolving the problem of what events must exist to constitute a sufficient emergency such that legislation directed to alleviate that emergency can justifiably become immediately effective. For a court to undertake its own independent resolution of such policy determinations creates the potential for "embarrassment from multifarious pronouncements by different branches of government on one question." *Baker, supra* at 217. Additionally, although our state constitution does not commit the power to declare an emergency to any single branch of government, it does grant the Legislature the power to make all laws necessary to guarantee "the purity of elections" and to "guard against abuses of the elective franchise." Const 1963, art 2, § 4. As this Court has noted, "The judiciary must be careful to respect the principle of separation of powers in these election situations." *Gracey v Grosse Pointe Farms Clerk*, 182 Mich App 193, 205; 452 NW2d 471 (1989).

Although in the instant case the Legislature has delegated certain rule-making powers to an administrative agency within the executive branch, that delegation does not obviate separation of powers concerns regarding the trial court's actions. First, the Legislature's power to delegate rule-making authority to an administrative agency for purposes of giving effect to

legislation is not a matter of dispute. *Coffman v State Bd of Examiners in Optometry*, 331 Mich 582; 50 NW2d 322 (1951). Such a delegation is constitutionally valid if the Legislature prescribes "standards . . . as reasonably precise as the subject matter requires or permits." *Osius v St Clair Shores*, 344 Mich 693, 698; 75 NW2d 25 (1956). The lawfulness of this delegation as concerns the instant case is not questioned by the parties or the majority opinion. Second, the Legislature has made the Governor's concurrence necessary for the promulgation of emergency rules. This provision undoubtedly recognizes the need for expediency in emergency situations—a need more easily fulfilled by requiring the consent of one individual than by requiring a vote in the House and Senate. Finally, the trial court's actions in this case effectively prevent the Legislature from enforcing § 55(6) of the MCFA. The actions condoned by the majority opinion ultimately prevent the Legislature from carrying out its constitutionally prescribed function of assuring "the purity of elections." Const 1963, art 2, § 4.

The case before us is "political" in much the same manner that *Baker v Carr* was a "political case." As *Baker* indicates, the decision to classify a situation as an "emergency" in order to get legislation put into immediate effect is a decision best left to the legislative and executive branches of government. *Baker, supra* at 217. If we allow the judiciary to second-guess this nonjusticiable political decision, the result could become largely dependent on the personal beliefs, understandings, and allegiances of particular trial court judges. In the interest of comity between the branches, such a result should be avoided.

In this respect, I take guidance from the analysis of the Idaho Supreme Court in *Diefendorf v Gallet*, 51 Idaho 619; 10 P2d 307 (1932) (later superseded by statute as stated in *John Hancock Mut Life Ins Co v Neill*, 79 Idaho 385; 319 P2d 195 [1957]). In *Diefendorf*, the court found that the judiciary could not second-guess the governor's determination that a sufficient emergency existed to justify convening an extraordinary session of the legislature.

> The determination as to whether facts exist such as to constitute "an extraordinary occasion" is for [the governor] alone to determine. The responsibility and the discretion are his, not to be interfered with by any other co-ordinate branch of the government.
>
> "It would be an unprecedented proceeding for the court to entertain a controversy wherein proof is offered to ascertain judicially whether an extraordinary occasion existed of sufficient gravity to authorize the governor to convene the legislature in extra session . . . . [A] review of such a discretionary act of the governor should not be done by the courts." [*Diefendorf, supra* at 638, quoting *Utah Power & Light Co v Pfost*, 52 F2d 226, 231 (CA DC, 1931).]

The court continued, " 'The motives which prompted the governor . . . to . . . make such determination are not proper subjects of judicial inquiry. Such inquiry would be opposed both to the plainest principles of public policy and the freedom of action by the executive within the constitutional authority of that department of government.' " *Diefendorf, supra* at 639, quoting *In re Moyer*, 12 Idaho 250, 257; 85 P 897 (1906). See also *Tenney v Brandhove*, 341 US 367, 372; 71 S Ct 783; 95 L Ed 1019 (1951).

I further note that current case law casts doubt upon the propriety of granting injunctive relief against the Governor and that the cases instead suggest that

the constitutional separation of powers precludes mandatory injunctive relief (mandamus) against the Governor. See, e.g., *Musselman v Governor*, 448 Mich 503, 524; 533 NW2d 237 (1995). As our Supreme Court recently recognized, declaratory relief generally will induce the legislative and executive branches to conform their actions to constitutional requirements or confine them within constitutional limits. *Durant v Michigan*, 456 Mich 175, 205; 566 NW2d 272 (1997). Only when declaratory relief has failed should courts consider more drastic forms of relief. *Id.* at 206. Indeed, Michigan case law over the past century recognizes the need for utmost delicacy on the part of the judiciary when the executive branch makes findings of fact or decides a "disputed question." See, e.g., *People ex rel Johnson v Coffey*, 237 Mich 591, 602; 213 NW 460 (1927); *Ayres, supra.*[3]

Whether an emergency exists is a manifestly political question, which accordingly lies beyond the power of the judiciary to reconsider. If the Governor has abused the power statutorily reposed in him—which I do not suggest is the case—the remedy is to be found in the political process. Those dissatisfied by the executive's actions may seek recall, Const 1963, art 2, § 8, campaign for impeachment, Const 1963, art 11, § 7, or propose legislation that would confer the power at issue on an inferior officer whose

---

[3] Although the emergency in the present case is of a political nature, the situation may be compared to a declaration of emergency prompted by mass rioting. If the Governor declared a state of emergency and requested military assistance to quell the rioting, it would be absurd to suggest that a rioter could go to court and ask for an injunction in order to prevent military involvement. However, by allowing review of the declaration of emergency, the majority apparently approves of such maneuvering.

exercise of discretion may properly be subjected to judicial review. Gubernatorial action of the kind in question, however, does not lend itself to judicial review or interference.[4]

Here, not only has the Governor made a finding that an emergency exists, but the Secretary of State, an inferior constitutional officer, initially made the identical finding. Further, the Secretary of State's involvement does not itself invite judicial review of the finding at issue. "When the head of a department acts as the mere assistant or agent of the executive in the performance of a political or discretionary act, [s]he is no more subject to the control of the courts than the chief executive himself . . . ." *Sutherland, supra* at 327. Hence, because the Secretary of State must obtain the Governor's imprimatur before promulgating emergency rules, such action is that of the governor and is beyond the proper scope of judicial intermeddling.

In any event, even if the judiciary could review the factual basis for a gubernatorial declaration of emer-

---

[4] Nor can it ever be said that any gubernatorial duty is merely ministerial:

> [I]t is not customary in our republican government to confer upon the governor duties merely ministerial, and in the performance of which he is to be left to no discretion whatever; and the presumption in all cases must be, where a duty is devolved upon the chief executive of the State rather than upon an inferior officer, that it is so because his superior judgment, discretion, and sense of responsibility were confided in for a more accurate, faithful, and discreet performance than could be relied upon if the duty were devolved upon an officer chosen for inferior duties. And if we concede that cases may be pointed out in which it is manifest that the governor is left to no discretion, the present is certainly not among them, for here, by the law, he is required to . . . give his certificate on his own judgment, and not on that of any other person, officer or department. [*Sutherland, supra* at 323.]

gency, the facts amply support that determination.
This conclusion may be reached under the majority's
confabulated standard of review or any other. The
majority opines that "we fail to perceive how preser-
vation of the political interests of the whole commu-
nity is threatened where the secretary is generally
free to attempt to enforce its [sic, her] interpretation
of § 55(6) of the MCFA except against the limited class
of the political committees of the union and its affili-
ated organizations." *Ante* at 24. This statement fails to
consider that the union and affiliated political action
committees (PACs) benefiting from the first injunction
compose one of the largest political fund-raising orga-
nizations in this state outside the major political par-
ties. That the circuit court's preliminary injunction
creates disparate classes of political players for the
next election cycle—the AFL-CIO unfettered in cadg-
ing its employees for political donations, the Chamber
of Commerce having to abide by the declaratory rul-
ing of the Secretary of State, and other similar organi-
zations remaining in limbo concerning how best to
comply with the MCFA—presents a clear and present
danger to the integrity of the political process.

The executive branch has determined that validly
adopted public policy cannot be effectively carried
out in the absence of administrative rules on the sub-
ject. That determination is supported by the facts and
should not be revisited by this Court. As a result of
the August 28, 1997, injunction, the Chamber of Com-
merce remains obliged to follow the dictates of
§ 55(6) of the MCFA as interpreted by the Secretary of
State, and most unions and political organizations will
likely feel obliged to comply as well; the AFL-CIO,
however, has license from the circuit court to collect

funds from its members for political advocacy with less stringent safeguards in place to ensure compliance with the requirements of the MCFA. If the August 28, 1997, order remains in effect, and if the emergency rules are not enforced, the union and its affiliates will have the opportunity to purchase, through paid advertising in all media, a grossly disproportionate and unfair influence in the upcoming elections. Moreover, because of the lack of an effective enforcement mechanism for the statutory prohibition of passive contribution systems, the rights of many individuals who do not wish to contribute to political campaigns are not adequately protected. This result of the judiciary's intrusion into nonjusticiable subject matter does violence to the spirit and intent of the MCFA.

### III. DECLARATORY RULING

This comedy of errors began when the circuit court allowed the AFL-CIO to present its case before it had exhausted available administrative remedies. It is only when a party has exhausted all administrative remedies available within an agency, and is aggrieved by a final decision in a contested case, that the agency's decision is subject to review by the courts. MCL 24.301; MSA 3.560(201).[5] The exhaustion requirement enables the parties and the agency to develop the facts and produce a complete record for review, to allow the agency to apply its expertise and correct its

---

[5] Because there was no development of the question of exhaustion in the proceedings below, the record does not provide a conclusive basis on which to consider potential exceptions to the exhaustion requirement, e.g., futility, administrative delay, or inadequate relief. However, these facts appear to give rise to no legitimate claim of futility or inadequacy of relief, and, where the agency was given no opportunity to pass on the union's method, delay cannot be charged to the administrative process.

own errors, and to promote judicial economy by preventing unnecessary resort to the courts. See *Compton Sand & Gravel Co v Dryden Twp*, 125 Mich App 383, 397; 336 NW2d 810 (1983), citing 2 Am Jur 2d, Administrative Law, § 595, p 428; *Abbott Laboratories v Gardner*, 387 US 136, 149-152; 87 S Ct 1507; 18 L Ed 2d 681 (1967); *Toilet Goods Ass'n, Inc v Gardner*, 387 US 158, 165-166, 87 S Ct 1520; 18 L Ed 2d 697 (1967). When the union initially appeared in court to contest the validity of the declaratory ruling, it had neither exhausted administrative remedies nor been aggrieved by the Secretary of State's decision.

The Secretary of State maintained the posture that the declaratory rulings at issue simply put into words certain dictates inherent in the MCFA itself and that the general applicability of the declaratory rulings stemmed from the general applicability of the statute. The circuit court apparently believed that the declaratory rulings themselves could trigger sanctions against the union for failure to abide by them, citing the criminal penalties of § 55(7) of the MCFA. However, this concern was premature.

The Administrative Procedures Act and the MCFA itself prescribe the processes under which a party may object to the Secretary of State's decisions and under which sanctions may come to bear on a noncomplying party. MCL 24.263; MSA 3.560(163) establishes that declaratory rulings are binding only on the parties requesting them and the agencies issuing them. Because in the instant case neither plaintiff requested the rulings at issue, neither was bound. Although "[a] declaratory ruling is subject to judicial review in the same manner as an agency final decision or order in a contested case," *id.*, a party who is

bound by neither a declaratory ruling nor a final decision presents no controversy for a court to entertain and resolve.

If the AFL-CIO believed its own procedures for obtaining its members' affirmative consent in each calendar year to the union's automatic extraction from its members of contributions for affiliated PACs to be fully in compliance with § 55(6) of the MCFA, the union was at liberty to present its schemes to the Secretary of State for its own declaratory ruling. Once a party to a declaratory ruling, by virtue of having requested it, MCL 24.263; MSA 3.560(163), the union would have satisfied the statutory criteria for seeking judicial review.

Alternatively, the union simply could have complied with § 55(6) of the MCFA according to its own judgment of the proper construction of the statute and waited for the Secretary of State to initiate proceedings. Section 15(5) of the act provides that where the Secretary of State has reason to believe that a violation has occurred, the Secretary of State should respond with informal methods to obtain compliance, including trying to reach conciliation agreements. That section further provides that if the Secretary of State fails to correct the violation through informal means, the Secretary of State may commence a hearing or refer the matter to the Attorney General for prosecution.

In the latter situation, the union would be free to urge its interpretations of § 55(6) on the trial court, which would rule on the matter de novo, affording the Secretary of State's interpretation only such persuasive sway as the underlying reasoning of the Secretary of State might be found to warrant.

In the event of an administrative hearing, § 15(6) of the MCFA provides for its conduct and decrees that if the Secretary of State determines afterward that a violation has occurred, the Secretary of State may assess a civil fine of up to $1,000 for each violation. Only then does the statute provide for recourse to the courts, providing that a "final decision and order" from the Secretary of State is subject to judicial review as provided by the APA.

Clearly, the AFL-CIO had not availed itself of all the available administrative procedures concerning its compliance with § 55(6) when it initially appeared before the circuit court seeking declaratory and injunctive relief. For these reasons, the court should have dismissed the cause of action. If the initial controversy in this case had been fully developed through proper administrative processes, the courts could have avoided the vexing problems that have arisen subsequently.

Had the circuit court recognized the union's failure to exhaust administrative remedies when considering the motion for the initial injunction, or had this Court granted leave to appeal the injunction and then taken that opportunity to reverse on that ground, this Court would have avoided the issue whether an emergency existed and the concomitant and colossal error of substituting its judgment for that of the executive branch of government. Finally, it would have avoided the absurd conclusion that it is acceptable to allow the stronger players in an election cycle to operate under rules more lenient than those under which the weaker players operate.

IV. CONCLUSION

The trial court should not have agreed to review the decision of the Governor concerning whether, given the circumstances, emergency rules were proper, let alone substituted its judgment for that of the executive branch regarding the existence of an emergency. Accordingly, I respectfully dissent from the majority's conclusions that the judiciary possesses the jurisdictional competence to review the Governor's finding of an emergency and that such finding is not supported by the acknowledged facts, as well as from the ultimate conclusion that the circuit court did not abuse its discretion in issuing a preliminary injunction. Given that the AFL-CIO did not exhaust administrative remedies before going to court, that the union is unlikely to succeed on the merits of its claim that the subsequent emergency rules are substantively invalid, and given that I believe not only that the trial court should not have reviewed the executive branch's finding of emergency, but also that the facts support a finding of emergency, I would reverse the decision of the trial court and dissolve both injunctions.