*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARC SLIS and 906 VAPOR,

Plaintiffs-Appellees,

v

STATE OF MICHIGAN and DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

Defendants-Appellants.

FOR PUBLICATION
May 21, 2020
9:00 a.m.

No. 351211
Court of Claims
LC No. 19-000152-MZ

A CLEAN CIGARETTE CORPORATION,

Plaintiff-Appellee,

v

GOVERNOR, STATE OF MICHIGAN, and
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

Defendants-Appellants.

No. 351212
Court of Claims
LC No. 19-000154-MZ

Before: MARKEY, P.J., and JANSEN and BOONSTRA, JJ.

MARKEY, P.J.

In these consolidated appeals, defendants appeal by leave granted the opinion and order of the Court of Claims granting plaintiffs' motions for a preliminary injunction. The ruling enjoined enforcement of emergency rules promulgated by defendant Department of Health and Human Services (DHHS) pursuant to MCL 24.248(1). In significant part, the emergency rules prohibit the sale and distribution of flavored nicotine vapor products in Michigan. The stated purpose of the emergency rules was to combat a vaping crisis among the youth of our state and protect them from nicotine product addiction. As required by MCL 24.248(1), defendant Governor concurred in the DHHS's finding that it was necessary to promulgate the emergency

-1-

rules.  Plaintiffs commercially sell vapor products that are now banned under the emergency rules, and they filed declaratory judgment actions against defendants alleging that the emergency rules are invalid.  We hold that the DHHS and the Governor are entitled to due deference with regard to the finding of an emergency under MCL 24.248(1), but not complete capitulation, and the Court of Claims ultimately did not abuse its discretion by issuing the preliminary injunction on the basis of the evidence presented by the parties.  Accordingly, we affirm.

## I.  CONSTITUTIONAL AND STATUTORY FRAMEWORK

"The public health and general welfare of the people of the state are hereby declared to be matters of primary public concern," and "[t]he legislature shall pass suitable laws for the protection and promotion of the public health."  Const 1963, art 4, § 51.  The Public Health Code, MCL 333.1101 *et seq.*, reflects the Legislature's continuing efforts to carry out its duties under the Michigan Constitution.  MCL 333.2221(1) provides:

> The [DHHS] shall continually and diligently endeavor to prevent disease, prolong life, and promote the public health through organized programs, including prevention and control of environmental health hazards; prevention and control of diseases; prevention and control of health problems of particularly vulnerable population groups; development of health care facilities and agencies and health services delivery systems; and regulation of health care facilities and agencies and health services delivery systems to the extent provided by law.

The DHHS may "[e]xercise authority and promulgate rules to safeguard properly the public health[.]"  MCL 333.2226(d).  And MCL 333.2233(1) similarly provides that "[t]he [DHHS] may promulgate rules necessary or appropriate to implement and carry out the duties or functions vested by law in the department."

The promulgation of administrative rules is governed by Chapter 3 of the Administrative Procedures Act of 1969 (APA), MCL 24.201 *et seq.*[1]  Generally, "before the adoption of a rule, an agency . . . shall give notice of a public hearing and offer a person an opportunity to present data, views, questions, and arguments."  MCL 24.241(1).  Publication requirements regarding the notice of public hearing are set forth in MCL 24.242.  MCL 24.248(1) describes the circumstances in which the normal procedural requirements in promulgating a rule need not be followed, providing:

> If an agency finds that preservation of the public health, safety, or welfare requires promulgation of an emergency rule without following the notice and

---

[1] A "rule" is defined as "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or rescission of the law enforced or administered by the agency."  MCL 24.207.  MCL 24.207(a) through (r) list a number of actions that are excepted from the definition.  There is no dispute that the instant cases concern a "rule" promulgated by the DHHS.

participation procedures required by [MCL 24.241 and MCL 24.242] and states in the rule the agency's reasons for that finding, and the governor concurs in the finding of emergency, the agency may dispense with all or part of the procedures and file in the office of the secretary of state the copies prescribed by [MCL 24.246] endorsed as an emergency rule, to 3 of which copies must be attached the certificates prescribed by [MCL 24.245] and the governor's certificate concurring in the finding of emergency. The emergency rule is effective on filing and remains in effect until a date fixed in the rule or 6 months after the date of its filing, whichever is earlier. The rule may be extended once for not more than 6 months by the filing of a governor's certificate of the need for the extension with the office of the secretary of state before expiration of the emergency rule. . . . .

## II.  PROMULGATION OF EMERGENCY RULES

We initially note that pursuant to 2019 PA 18, effective September 2, 2019, the Legislature amended the youth tobacco act (YTA), MCL 722.641 *et seq.*, extending the prohibition of sales of tobacco products to minors to also include "vapor products" and "alternative nicotine products."[2]  Subsequently, on September 18, 2019, the DHHS, relying on the legal authorities recited earlier, promulgated emergency rules entitled: "Protection of Youth from Nicotine Product Addiction."  2019 Mich Reg 18 (October 15, 2019), p 7.  The DHHS found that Michigan was confronted with a "vaping crisis among youth[,]" necessitating the promulgation of emergency rules to address the crisis.  *Id.*  The DHHS articulated numerous reasons for its finding, footnoting the sources for all of its factual assertions.  *Id.* at 7-8.  The general premise of the DHHS's position was that "[s]ince 2014, e-cigarettes (also known as vapor products) have been the most commonly used tobacco product among youth in the U.S."  *Id.* at 7.  The DHHS noted that "[i]n December of 2018, the United States Surgeon General Jerome Adams officially declared e-cigarette use among youth in the United States an epidemic."  *Id.* at 8.  The DHHS concluded that the "epidemic can . . . be attributed in large part to the appeal of flavored vapor products to youth as well as the advertising and promotional activities by companies that glamorize use of nicotine products nationwide."  *Id.*

---

[2] MCL 722.641(1) provides that "[a] person shall not sell, give, or furnish a tobacco product, vapor product, or alternative nicotine product to a minor, including, but not limited to, through a vending machine."  And MCL 722.642(3)(a) provides that a minor shall not "[p]urchase or attempt to purchase a vapor product or alternative nicotine product."  A "vapor product" is statutorily defined as "a noncombustible product that employs a heating element, power source, electronic circuit, or other electronic, chemical, or mechanical means, regardless of shape or size, that can be used to produce vapor from nicotine or any other substance, and the use or inhalation of which simulates smoking. . . . ."  MCL 722.644(h).

Under Rule 1(1)(c) of the emergency rules, a "flavored nicotine vapor product" is defined as "any vapor product that contains nicotine and imparts a characterizing flavor."[3] And a "characterizing flavor" is defined as "a taste or aroma, other than the taste or aroma of tobacco, imparted either prior to or during consumption of a tobacco product, vapor product, or alternative nicotine product, or any byproduct produced thereof." Rule 1(1)(a).[4]

Rule 2 of the emergency rules is the most pertinent provision for purposes of the two lawsuits, and it provides as follows:

> (1) Beginning 14 days after these rules are filed with the secretary of state, a retailer or reseller shall not:
>
> > (a) Sell, offer for sale, give, transport, or otherwise distribute, nor possess with intent to sell, give, or otherwise distribute a flavored nicotine vapor product.
> >
> > (b) Use imagery explicitly or implicitly representing a characterizing flavor to sell, offer for sale, give, or otherwise distribute a vapor product.
>
> (2) Beginning 14 days after these rules are filed with the secretary of state, a person shall not transport flavored nicotine vapor products intended for delivery to any retailer or reseller in violation of these rules.

Rule 3 addresses "fraudulent or misleading terms or statements to sell, offer for sale, give, or otherwise distribute vapor products." Rule 3(1). Rule 4 provides that "[b]eginning 14 days after these rules are filed with the secretary of state, the restrictions on advertising set forth at 21 CFR 1140.32 apply with equal force to vapor products. Violations of 21 CFR 1140.32 are violations of this rule."[5] Rule 5 states that the rules "apply with equal force to retailers and resellers utilizing online and other remote sales methods that are intended to deliver flavored nicotine vapor products to this state." Rule 6 regulates the placement of advertisements for vapor products in general. A violation of any of the emergency rules constitutes a misdemeanor that is punishable by incarceration "for not more than 6 months, or a fine of not more than $200, or both." Rule 7(1). Rule 8 provides that "[i]f any rule or subrule of these rules, in whole or in

---

[3] The emergency rules can be found in volume 18 of the 2019 Michigan Register, pages 9 and 10. See MCL 24.248(3) ("The emergency rule must be published in the Michigan register . . . .").

[4] The definition continues by indicating that a characterizing flavor "includes, but is not limited to, tastes or aromas relating to food or drink of any sort; menthol; mint; wintergreen; fruit; chocolate; vanilla; honey; candy; cocoa; dessert; alcoholic beverages; herbs; or spices." *Id.*

[5] 21 CFR 1140.32 concerns format and content requirements for labeling and advertising cigarettes and smokeless tobacco.

part, is found to be invalid by a court of competent jurisdiction, such decision will not affect the validity of the remaining portion of these rules." [6]

As required by MCL 24.248(1), the Governor concurred in the finding of an emergency and in the determination that the public interest required the promulgation of the emergency rules. The emergency rules were filed with the Secretary of State on September 18, 2019. Consistent with the parameters set forth in MCL 24.248(1), the emergency rules provided that they were to remain in effect for a period of 6 months. The emergency rules would have expired on March 18, 2020, but on March 11, 2020, the Governor filed a certificate of need for extension of the emergency, extending the effectiveness of the emergency rules another six months until September 18, 2020.[7] See MCL 24.248(1). The certificate of need cited new data and surveys that led the Governor to find that the trend of minors using e-cigarettes had "increased over the past year." The Governor also observed:

> The documented intensification of the vaping crisis only confirms what DHHS determined when it, with my concurrence, originally issued the Emergency Rules: to protect the public health and welfare from the emergent and worsening crisis of youth vaping, the Emergency Rules must go into effect immediately. The Emergency Rules' prohibition on flavored vapor products will significantly limit the appeal of vaping to youth, curbing the increase in new youth users.

## III.  THE LITIGATION

Plaintiff Marc Slis owns and operates plaintiff 906 Vapor, LLC, which is a retail store located in Houghton that sells a variety of vapor products, some of which contain nicotine with non-tobacco flavors. We collectively refer to these two plaintiffs as "Slis." On September 25, 2019, Slis filed an extensive complaint against the state and the DHHS in the Houghton Circuit Court seeking declaratory relief. In that original action, Slis first contended that the emergency rules were ultra vires. Slis also maintained that the emergency rules were invalid because: (1) there was no emergency justifying a departure from the procedural safeguards required by the APA; (2) assuming the circumstances warranted a somewhat urgent response, the DHHS could not skip all of the APA's procedural safeguards; and (3) assuming a true emergency, the threat only affected a small subgroup of the general public, which was insufficient as a matter of law to trigger the authority to promulgate emergency rules. Finally, Slis alleged that the emergency rules were substantively invalid because they were inconsistent with the legislative intent of the enabling statute and because they were arbitrary and capricious.

---

[6] The DHHS's findings and the emergency rules are attached as Appendix 1 to this opinion and are incorporated into the opinion.

[7] The certificate of need for extension of the emergency rules, which includes the Governor's findings, is attached as Appendix 2 to this opinion and is incorporated into the opinion. See MRE 202(a) (allows taking judicial notice of "regulations of . . . agencies of Michigan"); MCR 7.216(A)(4) (this Court may "permit . . . additions to the transcript or record").

Additionally, Slis filed a motion for preliminary injunction and an emergency ex parte motion for a temporary restraining order (TRO) that would prohibit defendants from enforcing the emergency rules pending a hearing on the motion for preliminary injunction. Slis claimed that his business would suffer an immediate and irreparable injury if the court did not enjoin enforcement of the emergency rules because the business would have to close its doors, terminate its employees, and destroy over 80% of its inventory. The circuit court denied the ex parte motion for a TRO on the basis of a technical defect, and shortly thereafter the case was transferred to the Court of Claims. On September 30, 2019, in the Court of Claims, Slis filed an emergency motion for expedited consideration of a renewed motion for TRO. Later that day, the Court of Claims denied Slis's motion.

Plaintiff, A Clean Cigarette Corporation (ACC), is a Michigan-based retailer of flavored vapor products. ACC operated 20 locations throughout the state, employed 53 people, and sold about 2500 flavored vapor cartridges a month that contained zero nicotine. On October 1, 2019, ACC filed a complaint against the state, the Governor, and the DHHS. On the same date, ACC filed a motion for TRO and order to show cause why a preliminary injunction should not issue. ACC alleged that it would suffer irreparable injury if the emergency rules were enforced because it would result in the closure of almost all of ACC's 20 locations. On October 2, 2019, the Court of Claims denied the motion for a TRO and ordered the consolidation of the two lawsuits. On October 4, 2019, ACC moved for a preliminary injunction, asserting:

> These emergency rules give no consideration or mention the impact the ban will have on adult vaping users who have elected to use flavored vapor in order to transition away from smoking cigarettes. Since vaping is already illegal for minors, all that this ban will accomplish is to take the flavored vaping options away from adults. Accordingly, ACC requests injunctive relief to avoid the irreparable harm this ban will cause to its business, employees, businesses like it and the tens of-thousands of Michigan adults that elect to use flavored vapor products in lieu of combustible tobacco products.

On October 4, 2019, ACC also filed an amended complaint against defendants, alleging four causes of action. ACC alleged an unjustified interference with interstate commerce, federal statutory preemption under 21 USC 387,[8] an uncompensated unconstitutional taking of ACC's property, and violation of the APA.

With respect to Slis's action, on October 1, 2019, the Court of Claims, having rejected issuance of a TRO, heard testimony on the issue whether Slis would suffer irreparable harm if a preliminary injunction did not issue. Slis testified that he purchased 906 Vapor after being a customer of the business for about 1-1/2 years. He had first tried e-cigarettes as a method to stop smoking regular cigarettes and was successful. He was only successful, however, after he tried flavored e-cigarettes. Slis asserted that he had between 200 and 500 customers at any given time. He maintained a number of business documents, including sales records, inventory data, sales receipts, invoices, and tax records. Slis testified that approximately 95% of his customers

---

[8] Federal law regarding tobacco products is governed by 21 USC 387 *et seq.*

used flavored vapor products. He contended that 906 Vapor would have to close its doors and file for bankruptcy if the emergency rules went into effect. Slis also asserted that if the flavored nicotine vapor products were taken off the shelves for six months, the nicotine would oxidize and change the color of the product.

The Court of Claims denied Slis's motion for a preliminary injunction, concluding that he had "not met the burden of demonstrating an irreparable harm for which there is no adequate remedy at law." Consistent with its order in the ACC suit, the Court of Claims consolidated Slis's suit with ACC's action. It denied Slis's motion for preliminary injunction without prejudice, stating that "all parties will have the opportunity for additional briefing, testimony, and argument" at a later hearing. In other words, the Court of Claims, given the consolidation, was prepared to entertain a full evidentiary hearing entailing Slis, ACC, and defendants regarding whether a preliminary injunction should issue. Nevertheless, Slis filed an application for leave to appeal, which this Court denied. *Slis v Michigan*, unpublished order of the Court of Appeals, entered October 7, 2019 (Docket No. 350888).

The Court of Claims held the preliminary-injunction hearing on October 8 and 9, 2019. Slis testified that 906 Vapor closed its doors on October 1, 2019, because of the inability to sell flavored vapor products. Slis explained that his average customer was a middle-aged, semi-professional person. Slis claimed that he always verified the ages of all customers by examining their identification and using an age-checker cellular phone application. Slis maintained that his business was dedicated to helping people stop smoking. He further contended that 80% to 90% of his clients who wanted to quit smoking were ultimately successful. When asked if his customers could travel the five-plus miles to Wisconsin or use the Internet to purchase the banned products, Slis testified that they had already begun doing so. Slis opined that if the emergency rules remained in effect for six months, all of his product could possibly expire in the interim. He was certain that expiration of his product would occur if the emergency rules were extended for an additional six months, which extension has now come to fruition. Slis also testified that he carried between $15,000 and $20,000 in business debt and $60,000 in personal debt and that 906 Vapor was his sole source of income. According to Slis, if the emergency rules remained in effect, he would have to declare bankruptcy.

Cary Lee testified that he started ACC in 2010 and that it presently had 19 retail stores in Michigan with 53 employees. He maintained that one of his stores had closed because of the emergency rules. Lee indicated that ACC sold flavored vapor products. He started the company after using e-cigarettes to quit smoking in 2010, and he wished to help others overcome their addictions. Lee claimed that it is a real fight to quit smoking and that it is easier to quit when the e-cigarette tastes better. His wife, Ramona Lee, testified that five more ACC stores would close on October 15, 2019, and then probably another five stores would follow if the emergency rules were not overturned. She observed that approximately 50% of ACC's inventory was illegal under the emergency rules.

Ramona Lee further indicated that ACC had 740,000 cartridges, which were worth approximately $3 million, that could not be sold under the emergency rules. She testified that before September 2, 2019, ACC sold $13,000 to $14,000 of product a day, excluding online sales, but since October 2, 2019, sales had diminished to approximately $9,000 a day. She also explained that 75% of online sales came from customers outside of Michigan, but flavored vapor

products had been removed from ACC's website in response to the emergency rules. Dawn Every, an ACC employee, testified that only 2.3% of the company's clients were between the ages of 18 and 25. David Haight, the Vice-President of ACC's operations, indicated that the amount of product that could not be sold was worth between $2.2 million and $2.5 million. Another ACC employee, Deleasha Trice, testified that using e-cigarettes had improved her health.

Amelia Howard testified that she was a Ph.D. candidate at the University of Waterloo in the Department of Sociology and Legal Studies. Her dissertation was on the historical technology of e-cigarettes, the integration of these products into the marketplace, and the "moral panic" over vaping. The Court of Claims qualified her as an expert regarding whether there existed a situation justifying the emergency rules. She disagreed that there was evidence showing that flavored vapor products were causing an increase in vaping, and she discussed her perceived flaws in the previous studies on the subject. Howard also talked about the studies cited in support of the emergency rules and the problems with those studies from her perspective. She opined that there was nothing to show that flavors caused vapor usage by minors. Howard attributed youth vapor usage partly to perceptions that it was safer than smoking. She testified that when she reviewed smoking and vaping statistics for Michigan, the state had double the average smoking rate among youth, but the state's vaping rates were half the national average. Howard spoke of the evolution of flavors in vaping products, which was a response to people who were trying to quit smoking but did not like the taste of the initial tobacco flavorings. After Howard discussed a study showing that the rise of flavored vaping products had led to smoking cessation, defendants conceded that the study had provided a correlation between adults using flavored e-cigarettes and their reduction in the use of combustible cigarettes.

Dr. Joneigh Khaldun testified that she was the Chief Medical Executive and the Chief Deputy Director for Health at the DHHS. She discussed her other experiences with health crises, including those involving the measles, hepatitis A outbreaks, and the opioid epidemic. Dr. Khaldun emphasized that it was important to respond quickly once a health problem is identified. She stated that vaping use by the young impacted general public health. Dr. Khaldun had examined national and state data about the number of youths using vaping products and opined that the high numbers amounted to a public health emergency. According to Dr. Khaldun, at one high school more than a third of the students used vaping products. She testified that there was evidence that many youths used flavors to initiate their vaping experiences.

Dr. Khaldun discussed the recent amendment of the YTA, which we alluded to earlier, that banned the sale of vaping products to individuals under the age of 18. Despite the legislative action, she still believed that the emergency rules were necessary because she had no reason to conclude that the statutory amendment would have any impact. Dr. Khaldun noted that the FDA had banned the sale of vaping products to minors in 2016. She reviewed a chart that tracked the percentage of high school students who used vaping products from November 2013 through March 2019. It showed that high school use continued to rise significantly even after the 2016 ban.

Dr. Khaldun additionally testified that e-cigarettes were not approved by the FDA as a smoking cessation product. She had not seen definitive evidence that e-cigarettes were effective in stopping the use of tobacco products overall. She further noted that another study showed that

tobacco-flavored products were one of the most popular flavors among adult e-cigarette users. When asked whether there would be any harm if the emergency rules were halted, Dr. Khaldun replied that there would indeed be harm because each new day without the ban would allow for the opportunity for a minor to gain access to flavored vapor products.

Dr. Khaldun testified that "the epidemic in the emergency is about youth being addicted to nicotine." She agreed that traditional combustible cigarettes were more harmful to the health of adults and children. But she claimed that there was no evidence about the long-term health effects of e-cigarettes. Dr. Khaldun also noted that the United States Surgeon General had officially declared e-cigarette use among youth as an emergency epidemic in December 2018. She conceded, however, that Michigan did not declare such an emergency until August 30, 2019. Dr. Khaldun acknowledged that one of the studies she cited did not show how many youths who vaped were previously using regular tobacco products.

Following the hearing, the Court of Claims issued an extensive written opinion and order that enjoined and restrained enforcement of the emergency rules. The Court of Claims made the following 16 specific findings of fact.

1. 906 Vapor is no longer a "going concern." Its inventory remains at its retail operation.

2. The business owner, Slis, has considerable business and personal debt such that resumption of business after expiration of the Emergency Order[9] is unlikely.

3. Customers of 906 Vapor have begun purchasing product from out-of-state vendors.

4. [ACC] has shuttered one retail center and is in the process of closing four others.

5. [ACC] had a considerable [I]nternet operation that, like its retail stores, relied on sale of flavored nicotine product.

6. [ACC's] [I]nternet operation has ceased advertising flavored nicotine product.

7. The "A Clean Cigarette" logo and name is posted on its retail operations, uniforms, e-cigarette cartridges and batteries.

8. [The terms] Clean and Cigarette cannot be used together per Rule number 3(2), of the Emergency Order.

_____

[9] This is a reference to the emergency rules.

9. The shelf life of vaping product whether for open or closed container systems is ten months or less.

10. [ACC] has contractually committed to receive additional product bearing its logo.

11. Neither Plaintiff sold products to minors.

12. E-cigarette users who were patrons of the plaintiffs overwhelmingly use flavored nicotine product.

13. [ACC] has over two million dollars of unusable product.

14. In reaching the conclusion that an emergent danger was posed by e-cigarette use among persons under th[e] age of 18 in Michigan, the [DHHS] cited numerous studies . . . .

15. The [DHHS] considered the passage of Public Act 18 when it recommended the emergency rules.

16. The [DHHS] had a basis for its determination that Public Act 18 would not be a significant deterrent to youth e-cigarette use. That basis was derived from the historic data on e-cigarette use in other states which adopted similar legislation to Public Act 18 prior to Michigan.

The Court of Claims next reviewed the factors to be considered in determining whether to issue a preliminary injunction. It found that plaintiffs would suffer irreparable harm if the emergency rules were not enjoined. With respect to whether plaintiffs were likely to succeed on the merits, the Court of Claims noted that plaintiffs had argued that the DHHS had no rulemaking authority on the subject-matter. But it found that it did not need to reach that particular issue because it agreed with plaintiffs' argument that the emergency rules were procedurally invalid for the reason that there was no "emergency." Therefore, the Court of Claims determined that plaintiffs had demonstrated a likelihood of success on the merits.[10]

The Court of Claims discussed the difference between an "emergent" problem such as teen vaping and a true emergency that "required" the DHHS to suspend the normal rulemaking process under the APA. It opined that the DHHS was required to do more than simply identify a problem; the DHHS was also required to articulate proper justification to take a shortcut in promulgating rules. The Court of Claims ruled that plaintiffs had the better argument with respect to whether the circumstances mandated the promulgation of the emergency rules pursuant to MCL 24.248. It noted that the sources, information, data, and surveys upon which the DHHS had relied were available at the latest in February 2019, yet the DHHS had waited

---

[10] The Court of Claims made clear that it was not rendering judgment on the DHHS's policy goals and what it was attempting to achieve.

-10-

eight months to take any action. During this time, according to the Court of Claims, the normal APA procedures could have been employed and run their course. The Court of Claims found that the old informational materials, coupled with the DHHS's failure to act promptly, undermined the declaration of an emergency. It rejected the DHHS's explanation for the delay that Dr. Khaldun had only recently been appointed as Chief Medical Executive, because DHHS could still have done something earlier. The Court of Claims ruled that the DHHS could not "create an emergency by way of its own failure to act," finding plaintiffs' citation to federal authority for this proposition persuasive.

Balancing the harms to the parties, the Court of Claims noted that defendants had not argued that they would suffer any harm if the preliminary injunction were issued. With respect to whether the injunction would harm the public, the Court of Claims found that each side had presented a compelling argument. On one hand, were an injunction issued, youth could gain access to flavored nicotine vapor products, and there was evidence which suggested that there were risks to youth who used vaping products. On the other hand, plaintiffs had presented evidence to show that there was a real risk of harm to smokers who had used flavored vaping products as a substitute for more harmful combustible tobacco products and that they could go back to those products if flavored vaping products were banned. The Court of Claims ultimately found that the balancing factor did not weigh heavily for either side. It then ruled that the various factors, taken together, supported the issuance of the preliminary injunction.

Defendants applied for leave to appeal to this Court on October 25, 2019. They subsequently filed a bypass application for leave in the Michigan Supreme Court that was rejected. *Slis v Michigan*, 505 Mich 943 (2019) ("the Court is not persuaded that the question presented should be reviewed by this Court before consideration by the Court of Appeals"). This Court granted leave to appeal limited to the issues raised in the applications, expedited the appeals, consolidated the two cases, and denied defendants' motion for a stay. *Slis v Michigan*, unpublished order of the Court of Appeals, entered December 9, 2019 (Docket No. 251211); *A Clean Cigarette Corp v Governor*, unpublished order of the Court of Appeals, entered December 9, 2019 (Docket No. 251212).

## IV. ANALYSIS

### A. STANDARDS OF REVIEW

We review for an abuse of discretion a trial court's ruling on a request for a preliminary injunction. *Mich AFSCME Council 25 v Woodhaven-Brownstown Sch Dist*, 293 Mich App 143, 146; 809 NW2d 444 (2011). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.* The factual findings that a trial court makes in the process of deciding whether to grant a preliminary injunction are reviewed for clear error. *Id.* Associated issues involving statutory interpretation are reviewed de novo by this Court as questions of law. *Id.* We also review de novo the interpretation of a rule or regulation adopted by an agency pursuant to statutory authority. *United Parcel Serv, Inc v Bureau of Safety & Regulation*, 277 Mich App 192, 202; 745 NW2d 125 (2007). And similarly, this Court reviews de novo constitutional issues. *Harvey v Michigan*, 469 Mich 1, 6; 664 NW2d 767 (2003).

### B. PRINCIPLES OF STATUTORY INTERPRETATION

This Court's role in construing statutory language is to discern and ascertain the intent of the Legislature, which may reasonably be inferred from the words in the statute. *Mich Ass'n of Home Builders v City of Troy*, 504 Mich 204, 212; 934 NW2d 713 (2019). We must focus our analysis on the express language of the statute because it offers the most reliable evidence of legislative intent. *Id.* When statutory language is clear and unambiguous, we must apply the statute as written. *Id.* A court is not permitted to read anything into an unambiguous statute that is not within the manifest intent of the Legislature. *Id.* Furthermore, this Court may not rewrite the plain statutory language nor substitute its own policy decisions for those decisions already made by the Legislature. *Id.* at 212-213.

"Judicial construction of a statute is only permitted when statutory language is ambiguous." *Noll v Ritzer*, 317 Mich App 506, 511; 895 NW2d 192 (2016). A statute is ambiguous when an irreconcilable conflict exists between statutory provisions or when a statute is equally susceptible to more than one meaning. *People v Hall*, 499 Mich 446, 454; 884 NW2d 561 (2016). "When faced with two alternative reasonable interpretations of a word in a statute, we should give effect to the interpretation that more faithfully advances the legislative purpose behind the statute." *People v Adair*, 452 Mich 473, 479-480; 550 NW2d 585 (1996).

## C. LAW GOVERNING PRELIMINARY INJUNCTIONS IN GENERAL

A preliminary injunction is generally considered a form of equitable relief that has the objective of maintaining the status quo pending a final hearing concerning the parties' rights. *Mich AFSCME Council 25*, 293 Mich App at 146. Four factors must be taken into consideration by a court when determining if it should grant the extraordinary remedy of a preliminary injunction to an applicant: (1) whether the applicant has demonstrated that irreparable harm will occur without the issuance of an injunction; (2) whether the applicant is likely to prevail on the merits; (3) whether the harm to the applicant absent an injunction outweighs the harm an injunction would cause to the adverse party; and (4) whether the public interest will be harmed if a preliminary injunction is issued. *Pontiac Fire Fighters Union Local 376 v Pontiac*, 482 Mich 1, 6 n 6; 753 NW2d 595 (2008); *Mich Coalition of State Employee Unions v Civil Serv Comm*, 465 Mich 212, 225 n 11; 634 NW2d 692 (2001); *Thermatool Corp v Borzym*, 227 Mich App 366, 376; 575 NW2d 334 (1998). "[A] preliminary injunction should not issue where an adequate legal remedy is available." *Pontiac Fire Fighters*, 482 Mich at 9. "The mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Id.* The party requesting "injunctive relief has the burden of establishing that a preliminary injunction should be issued . . . ." MCR 3.310(A)(4).

## D. REVIEW OF AN AGENCY'S ACTION TO PROMULGATE EMERGENCY RULES UNDER MCL 24.248

The Court of Claims effectively concluded that there was no true emergency as necessary to permit the DHHS and Governor to proceed under MCL 24.248(1) and promulgate the emergency rules without a hearing and public participation, which are typically required in the process of promulgating a rule. On the basis of this conclusion, the Court of Claims found that plaintiffs were likely to prevail on the merits of their complaints. The likelihood of success on the merits—one of the factors to consider in ruling on a request for a preliminary injunction—was the driving force behind the ruling, and defendants devote the vast majority of their brief

addressing the issue. In examining whether there was an emergency justifying a suspension of normal rulemaking procedures, the Court of Claims applied de novo review, treating the issue as one of statutory construction of MCL 24.248(1). Whether plaintiffs are likely to prevail on the merits can potentially be influenced by the standard or scope of review and the level of deference, if any, that is applicable to the finding by the DHHS and the Governor that the preservation of the public health, safety, or welfare required promulgation of the emergency rules. We shall examine the APA, the Michigan Constitution, and the caselaw, primarily this Court's decision in *Mich State AFL-CIO v Secretary of State*, 230 Mich App 1; 583 NW2d 701 (1998), in a quest to identify the proper standard for reviewing and assessing the DHHS's actions made in conjunction with the Governor under MCL 24.248(1).[11]

The issue of whether the preservation of the public health, safety, or welfare requires promulgation of an emergency rule without having to comply with the normal notice and participation procedures involves, for the most part, a factual inquiry. And it is in regard to this factual inquiry that we search for any applicable standards in judging the factual findings ultimately made by the DHHS in association with the Governor. This theoretically includes the possibility that the standard is that factual findings are not subject to any judicial review. To the extent that statutory construction of MCL 24.248(1) plays a role in making the determination whether to promulgate an emergency rule, e.g., defining the term "preservation," the matter would generally present a question of law subject to de novo review. *Mich State AFL-CIO*, 230 Mich App at 24.[12] Here, our review of the emergency rules and the underlying findings does not reveal any express instances of the DHHS or the Governor engaging in statutory interpretation.

## 1. THE APA

Chapter 6 of the APA, MCL 24.301 *et seq.*, provides for judicial review, but this review is only for persons "aggrieved by a final decision or order in a contested case[.]" MCL 24.301. And a "contested case" is defined as "a proceeding, including rate-making, price-fixing, and licensing, in which a determination of the legal rights, duties, or privileges of a named party is required by law to be made by an agency after an opportunity for an evidentiary hearing." MCL 24.203(3). The promulgation of the emergency rules did not entail a contested case; therefore, judicial review under Chapter 6 of the APA, including the provision regarding the scope of review, MCL 24.306, was not applicable. See MCL 24.207(f) (a "rule" does not include "[a] determination, decision, or order in a contested case"); *Mich Ass'n of Home Builders v Dir of Dep't of Labor & Economic Growth*, 481 Mich 496, 498; 750 NW2d 593 (2008) ("[T]he review of an administrative rule is categorized as involving a non-contested case.").

---

[11] Keep in mind that we are not tasked with making, nor do we make, any conclusive determinations regarding the merits of the lawsuits; rather, our opinion is focused on whether the preliminary injunction was properly issued and our analysis must be read in that context.

[12] We do note that "[a]n administrative agency's interpretation of a statute that it is obligated to execute is entitled to respectful consideration, but it cannot conflict with the plain meaning of the statute." *Hegadorn v Dep't of Human Servs Dir*, 503 Mich 231, 244; 931 NW2d 571 (2019).

-13-

MCL 24.248 itself does not provide for any type of judicial review of an emergency rule promulgated by an agency, but it also has no language prohibiting judicial review. We next consider MCL 24.264, which provides, in pertinent part, as follows:

Unless an exclusive procedure or remedy is provided by a statute governing the agency, the validity or applicability of a rule, including the failure of an agency to accurately assess the impact of the rule on businesses, including small businesses, in its regulatory impact statement, may be determined in an action for declaratory judgment if the court finds that the rule or its threatened application interferes with or impairs, or imminently threatens to interfere with or impair, the legal rights or privileges of the plaintiff. . . . This section shall not be construed to prohibit the determination of the validity or applicability of the rule in any other action or proceeding in which its invalidity or inapplicability is asserted.

We agree with plaintiffs that MCL 24.264 gave them the right to challenge the validity of the emergency rules under the plain and unambiguous language of the statute. See *Mich Ass'n of Home Builders*, 481 Mich at 499 ("MCL 24.264 allows a plaintiff to challenge the validity of a rule in an action for a declaratory judgment."). An agency rule can be deemed substantively invalid when the subject matter of the rule falls outside of or goes beyond the parameters of the enabling statute, when the rule does not comply with the intent of the Legislature, or when the rule is arbitrary or capricious. *Mich State AFL-CIO*, 230 Mich App at 15.[13] A rule can also be characterized as procedurally invalid if it was not properly promulgated, e,g., when a required hearing was not conducted. *Id.* at 25; see also *Goins v Greenfield Jeep Eagle, Inc*, 449 Mich 1, 8-10; 534 NW2d 467 (1995) (the failure to comply with a procedural requirement found in a statute will render a purported rule invalid). MCL 24.264 broadly applies to all rules. There is no restrictive language indicating or suggesting that it does not apply to a challenge of "emergency" rules. Were this panel to recognize such an exception or limitation in MCL 24.264, we would be reading language into an unambiguous statute that is not within the manifest intent of the Legislature. *City of Troy*, 504 Mich at 212.

Furthermore, there is no exclusive procedure or remedy provided in a different statute governing the DHHS with respect to challenging the validity of a rule promulgated by the DHHS. We have scoured the Public Health Code, including Part 22, MCL 333.2201 *et seq.*, which encompasses the DHHS's rulemaking authority, and there is no available procedure or remedy in regard to challenging a promulgated rule, nor language barring a challenge. We reject any contention that MCL 24.248—the statute authorizing the promulgation of an emergency

---

[13] Our Supreme Court in *Ins Institute of Mich v Comm'r, Fin & Ins Serv, Dep't Labor & Economic Growth*, 486 Mich 370, 385; 785 NW2d 67 (2010), also indicated that courts use a three-part test to determine the validity of a rule: (1) whether the rule is within the subject matter encompassed by the enabling statute; (2) if so, whether the rule complies with the underlying legislative intent; and (3) if the rule meets the first two requirements, whether it is arbitrary or capricious.

rule—provides "an exclusive procedure or remedy," as that phrase is used in MCL 24.264. The "exclusive procedure or remedy" language of MCL 24.264 plainly and unambiguously pertains to a procedure or remedy related to challenging the validity of a rule, not just any procedure or remedy. Although MCL 24.248 sets forth the *exclusive procedure* to promulgate an emergency rule, it has no language with regard to allowing or disallowing the challenge of an emergency rule.

Moreover, MCL 24.248 is not a statute specifically governing the DHHS such that it could conceivably constitute an exception to the general applicability of MCL 24.264's authorization of declaratory judgment actions to challenge the promulgation of allegedly invalid rules. MCL 24.248(1) governs the promulgation of emergency rules by any agency or agencies in general; it is not specifically "a statute governing the [DHHS]," MCL 24.264. In our view, MCL 24.264 reveals a general legislative intent to provide an avenue for a party to challenge a rule promulgated by an agency, whether under MCL 24.264 itself or under another statute that governs the agency. If the Legislature does not intend for judicial review of a promulgated rule under certain circumstances or in connection with a particular agency, it can easily accomplish that goal with language to that effect. And we have not been directed to any statutory language that prohibits judicial review of the DHHS's emergency rules. Moreover, as discussed in detail below, this Court in *Mich State AFL-CIO*, 230 Mich App at 25, directly held that emergency rules promulgated under MCL 24.248 can be contested in the courts.

MCL 24.264 gives a party access to the courts through an action for declaratory judgment, but it is silent with respect to any type of review standard that a trial court should apply in determining whether an agency's rule, emergency or otherwise, is invalid or whether it was invalidly promulgated. MCL 24.264 does not indicate one way or the other whether any deference should be given by the courts to an agency in the course of a declaratory judgment action. And the statute does not expressly provide that underlying fact-finding by an agency can be challenged in an action.

## 2. THE MICHIGAN CONSTITUTION

Const 1963, art 6, § 28, provides, in part:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. . . . .

The promulgation of an agency rule does not constitute a decision by the agency that is judicial or quasi-judicial in nature; therefore, Const 1963, art 6, § 28, does not apply to the instant cases.[14]

Defendants raise a constitutional separation of powers argument with no citation of supporting precedent that is pertinent and binding. "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2. In *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 97-98; 754 NW2d 259 (2008), our Supreme Court stated:

> This case implicates the powers, and the boundaries of the powers, of all three branches: the Legislature, the judiciary, and administrative agencies, which are part of the executive branch. . . . .

> The people of the state of Michigan have divided the powers of their government into three branches: legislative, executive and judicial. Furthermore, no person exercising the powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.

> The legislative power of the State of Michigan is vested in a senate and a house of representatives. Simply put, legislative power is the power to make laws. In accordance with the constitution's separation of powers, this Court cannot revise, amend, deconstruct, or ignore the Legislature's product and still be true to our responsibilities that give our branch only the judicial power. While administrative agencies have what have been described as "quasi-legislative" powers, such as rulemaking authority, these agencies cannot exercise legislative power by creating law or changing the laws enacted by the Legislature. [Quotation marks, citations, and alterations omitted.]

The Legislature gave authority to the DHHS to promulgate rules as reflected in sections 2226 and 2233 of the Public Health Code, and the Legislature provided the DHHS and other agencies the authority to promulgate emergency rules to preserve the public health, safety, or welfare, with the concurrence of the Governor, MCL 24.248(1). Because the DHHS, as an

---

[14] In *Natural Resources Defense Council v Dep't of Environmental Quality*, 300 Mich App 79, 86; 832 NW2d 288 (2013), this Court explained:

> [N]ot all agencies' actions are taken in a judicial or quasi-judicial capacity. To determine whether an administrative agency's determination is adjudicatory in nature, courts compare the agency's procedures to court procedures to determine whether they are similar. Quasi-judicial proceedings include procedural characteristics common to courts, such as a right to a hearing, a right to be represented by counsel, the right to submit exhibits, and the authority to subpoena witnesses and require parties to produce documents. [Citations omitted.]

-16-

agency, is part of the executive branch, Const 1963, art 5, § 2, as is, of course, the Governor, Const 1963, art 5, § 1, the Legislature effectively gave quasi-legislative authority to the executive branch to promulgate emergency rules under the circumstances provided in MCL 24.248(1). But the Legislature, by enacting MCL 24.264, also gave the judiciary the power to issue declaratory judgments with respect to whether agency rules are valid or invalid, including, as we have held, emergency rules. The exercise of this authority can result in an emergency rule being struck down by a court, despite being promulgated by the DHHS and approved by the Governor. Under this structural framework enacted by our Legislature, we cannot conclude that the judiciary improperly encroaches on the province of the executive branch by preliminarily enjoining the enforcement of an emergency rule in a declaratory judgment action such that there is a separation-of-powers violation. Nevertheless, whether separation of powers requires a standard or scope of review that gives some level of deference to the fact-finding by the DHHS and Governor under MCL 24.248(1) is a separate question that we shall return to later in this opinion.[15]

### 3. CASELAW

The parties direct much of their attention to this Court's opinion in *Mich State AFL-CIO*, 230 Mich App 1, which is binding precedent. See MCR 7.215(J)(1). In *Mich State AFL-CIO*, the plaintiff labor union initially obtained an injunction banning the enforcement or implementation of a declaratory ruling and interpretive statement issued by the Secretary of State regarding a provision in the Michigan Campaign Finance Act (MCFA), MCL 169.201 *et seq*. *Mich State AFL-CIO*, 230 Mich App at 8-9. The labor union had successfully argued that the Secretary of State's declaratory ruling and interpretive statement did not find statutory support in the MCFA and that the interpretive statement constituted a "rule" that was not properly promulgated under the APA. *Id.* at 9. In response to the injunction, the Secretary of State proceeded to promulgate emergency rules under MCL 24.248 that essentially mimicked its prior declaratory ruling and interpretive statement construing the relevant MCFA provision. *Id.* at 10-11. The labor union then obtained a preliminary injunction enjoining the Secretary of State's enforcement of the emergency rules. *Id.* at 12. The trial "court concluded that no emergency had existed." *Id.* The trial court also ruled that the emergency rules exceeded the statutory language in the MCFA. *Id.* at 13.

On appeal, this Court affirmed the trial court's ruling, albeit for different reasons. *Id.* at 25. The Court first indicated:

> Rules adopted by an agency in accordance with the APA are legislative rules that have the force and effect of law. In this case, the secretary adopted the emergency rules pursuant to § 48 of the APA. We conclude that the emergency rules are legislative rules that, if valid, have the force and effect of law. [*Id.* at 14-15 (citation omitted).]

---

[15] As mentioned earlier, this includes contemplation whether agency fact-finding is entirely unreviewable under any circumstance.

The Court then addressed whether the emergency rules were substantively valid, which, as we noted earlier, implicated a three-part test that considers: "(1) whether the rule is within the subject matter of the enabling statute; (2) whether it complies with the legislative intent underlying the enabling statute; and (3) whether it is arbitrary or capricious." *Id.* at 15 (quotation marks and citations omitted).[16] After analyzing the issue, the Court held:

> Accordingly, for purpose only of our preliminary injunction analysis, we conclude that the trial court apparently misjudged the strength of the union's demonstration that it is likely to prevail on the merits of its claim for declaratory relief that the secretary's emergency rules are substantively invalid. However, we emphasize that if and when this matter comes to trial, the actual determination of this claim is for the trial court in the first instance. [*Id.* at 17.]

The Court next addressed whether the trial court erred by finding that no emergency existed. *Id.* The Court cited and reviewed *Mich Petroleum Ass'n v State Fire Safety Bd*, 124 Mich App 187; 333 NW2d 506 (1983), in which this Court affirmed a lower court decision that rejected an argument that no emergency existed for purposes of emergency rules promulgated under MCL 24.248. *Mich State AFL-CIO*, 230 Mich App at 18. The *Mich State AFL-CIO* panel stated that "it appears that the test adopted by *Michigan Petroleum* was whether the adopting agency lacked a substantial basis for its finding that the public interest required promulgation of the emergency rule" and that "[t]he opinion also seemed to include an abuse of discretion aspect to the test." *Mich State AFL-CIO*, 230 Mich App at 19 (quotation marks and citations omitted). The Court in *Mich State AFL-CIO* was "not convinced that the 'substantial basis' or 'abuse of discretion' tests are the appropriate tests." *Id.* at 20. The panel accurately indicated that the "substantial basis" test employed in *Mich Petroleum* was not supported by any citation of authority. *Mich State AFL-CIO*, 230 Mich App at 19; *Mich Petroleum*, 124 Mich App at 193-194. We also note that the analysis in *Mich Petroleum* was cursory and that *Mich Petroleum* is not binding precedent. MCR 7.215(J)(1).

This Court moved on with its analysis and, quoting in part the language in MCL 24.248(1), observed as follows:

> An emergency rule is justified if three conditions are satisfied: (1) the agency "finds that preservation of the public health, safety, or welfare requires promulgation of an emergency rule without following the notice and participation

---

[16] The Court effectively treats this three-part test as the authority for challenging an agency rule; the panel did not refer to or cite MCL 24.264. We find it interesting that the three-part test, when it is traced back to its origin, including through Supreme Court rulings, comes from this Court's opinion in *Chesapeake & Ohio R Co v Mich Pub Serv Comm'n*, 59 Mich App 88, 98-99; 228 NW2d 843 (1975), which cited *nothing* in support of the test. Therefore, it appears that there is a statutory and a common-law basis to challenge an agency's rule. This does not take away anything from our reliance on MCL 24.264 in analyzing the separation of powers issue and in searching for a standard or scope of review relative to agency fact-finding tied to rule promulgation.

-18-

procedures required by section 41 and 42;" (2) the agency "states in the rule the agency's reasons for that finding"; and (3) "the governor concurs in the finding of emergency." [*Mich State AFL-CIO*, 230 Mich App at 21.]

After examining the definition of "public welfare" in *Black's Law Dictionary* (6th ed), this Court ruled:

> [I]n order to bypass the general rule-making procedural protections contained in the APA, the secretary in this case was required to find that the preservation of the political interests of the public at large, or of a whole community, as distinguished from the advantage of an individual or limited class required promulgation of an emergency rule. [*Mich State AFL-CIO*, 230 Mich App at 22 (quotation marks omitted).]

The Court then reviewed the Secretary of State's finding of an emergency, determining that the basis for the finding was the original "injunction that enjoined the enforcement of the secretary's declaratory ruling." *Id.* at 23. But the panel noted that the injunction had only enjoined the Secretary of State from enforcing the declaratory ruling against the labor union and its affiliated organizations. *Id.* The Court pointed out that the declaratory ruling could still be enforced by the Secretary of State against all other entities subject to the MCFA. *Id.* The Court failed "to perceive how preservation of the political interests of the whole community is threatened where the secretary is generally free to attempt to enforce its interpretation of . . . the MCFA except against the limited class of the political committees of the union and its affiliated organizations." *Id.* at 24. Accordingly, the Court concluded that the emergency finding by the Secretary of State related only to the advantage of a limited class. *Id.* The panel then ruled:

> A rule is invalid and may be stricken by a court if the agency failed to follow proper procedure. Generally, this principle applies where the agency fails to promulgate a rule in accordance with the APA's notice-and-participation procedures. However, we see no reason why this principle should not apply to emergency rules should the agency fail to follow the procedures and standards enunciated in § 48 of the APA, particularly where these procedures and standards take the place of the general rule-making procedural protections contained in the APA. It thus appears that the secretary's emergency rules are procedurally invalid because the secretary's finding did not meet the statutory threshold imposed by the Legislature. We note that we have treated this issue as an issue of statutory construction, which is a question of law that we review de novo. However, we would arrive at the same conclusion even if the "substantial basis" and "abuse of discretion" tests enunciated in *Michigan Petroleum* are the appropriate tests. [*Id.* at 24-25 (citations omitted).]

Therefore, this Court held that the trial court had not erred by determining that the labor union was likely to prevail on the merits of its claim that the emergency rules were procedurally invalid. *Id.* at 25. The Court ended its opinion with the following summarization:

> [W]e conclude that the trial court apparently misjudged the strength of the union's demonstration that it is likely to prevail on the merits of its claim for

declaratory relief that the secretary's emergency rules are substantively invalid. However, we conclude that the trial court did not err in determining that the union is likely to prevail on the merits of its claim for declaratory relief that the emergency rules are procedurally invalid. No persuasive arguments have been made that the trial court erred in its consideration of the other preliminary injunction factors, and we will not, therefore, second-guess the trial court in this regard. The grant of a preliminary injunction with respect to the emergency rules preserved the status quo pending a final hearing and did not grant any of the parties final relief before a hearing on the merits. Accordingly, we conclude that on the facts of this particular case the trial court did not abuse its discretion in preliminarily enjoining the enforcement of the emergency rules. [*Id.* (citation omitted).]

We first note that *Mich State AFL-CIO* fully supports our earlier determination that emergency rules promulgated under MCL 24.248(1) can be challenged in court and are subject to possible invalidation on the basis of procedural or substantive deficiencies. With respect to conclusively identifying a standard or scope of review of an agency's finding that the surrounding circumstances required promulgation of an emergency rule, *Mich State AFL-CIO* is not of much assistance. The Court was not convinced that a "substantial basis" or an "abuse of discretion" test was the appropriate test, but it did not definitively reject those tests, even determining that it would have reached the same result under both of the tests. The Court employed de novo review, treating the issue as one of statutory construction. And the Court did indeed interpret MCL 24.248(1) as not being applicable when a rule only preserves the welfare of a limited class or an individual and not the welfare of the public at large. It does not appear that there was any factual dispute that the welfare of only a limited class was preserved under the emergency rules. Thus, the Court was not forced to assess a factual finding, resolve a factual dispute, or identify a standard or scope of review relative to a factual finding made by the Secretary of State in the process of promulgating the emergency rules. The appeal was ultimately decided on the Court's legal interpretation of "public welfare."

### 4. RESOLUTION – GIVING DEFERENCE TO THE DHHS AND GOVERNOR

Initially, we do agree with defendants that a finding by a court that promulgation of emergency rules was not necessary to preserve the health, safety, or welfare of the public is not a finding that the emergency rules are *procedurally* invalid. Defendants fully complied *with the procedures* for promulgating the emergency rules under MCL 24.248. We disagree with this Court's characterization in *Mich State AFL-CIO* that the emergency rules in that case were procedurally invalid; rather, the Court ruled that the factual circumstances, given its construction of MCL 24.248(1), did not justify invocation of emergency rules, which is not a procedural flaw or failure. Regardless, it does not matter what moniker is used in describing an invalid rule; an invalid rule is an invalid rule.

Next, we conclude that agency fact-finding under MCL 24.248(1) related to determining whether the circumstances justify the promulgation of emergency rules is reviewable by a court. Although this Court's decision in *Mich State AFL-CIO* was focused and primarily based on

construction of MCL 24.248(1), the interpretation was ultimately and necessarily applied to the essentially undisputed fact that only a limited class was benefited by the emergency rules. In other words, the Court held that preservation of the public health, safety, or welfare did not require promulgation of the emergency rules without following the notice and participation safeguards. Furthermore, the language in MCL 24.264 that authorizes declaratory judgment actions to challenge the validity of a rule does not place any limits or restrictions *on the legal basis of a challenge*, thereby allowing an argument that erroneous agency fact-finding rendered a rule invalid. This still leaves the question whether any deference should be given to agency fact-finding.

As discussed earlier, MCL 24.248 and MCL 24.264 do not provide any standards for reviewing agency fact-finding that occurs in promulgating a rule or in deciding whether to promulgate an emergency rule. And the standards for reviewing agency fact-finding in MCL 24.306 and Const 1963, art 6, § 28, have no application outside of contested cases and agency decisions that are judicial or quasi-judicial in nature. Promulgating a rule entails neither circumstance. The caselaw that recognizes that deference must be given to fact-finding by administrative agencies, which we recite below, links the deferential standard to the evidentiary-review provisions in MCL 24.306 and Const 1963, art 6, § 28. MCL 24.306(1)(d) authorizes a court to set aside an agency's decision when it is "[n]ot supported by competent, material and substantial evidence on the whole record." Const 1963, art 6, § 28, similarly provides that an agency's decisions, findings, rulings, and orders are reviewed, in part, to determine whether they "are supported by competent, material and substantial evidence on the whole record." With respect to both the statutory and constitutional provisions, this Court has emphasized that "[c]ourts should accord due deference to administrative expertise and not invade administrative fact finding by displacing an agency's choice between two reasonably differing views." *Dignan v Mich Pub Sch Employees Retirement Bd*, 253 Mich App 571, 576; 659 NW2d 629 (2002); see also *MERC v Detroit Symphony Orchestra, Inc*, 393 Mich 116, 124; 223 NW2d 283 (1974); *Monroe v State Employees' Retirement Sys*, 293 Mich App 594, 607; 809 NW2d 453 (2011); *Lewis v Bridgman Pub Sch (On Remand)*, 279 Mich App 488, 496; 760 NW2d 242 (2008).

This deferential standard, while not expressly set forth in either Const 1963, art 6, § 28, or MCL 24.306, grew out of and is viewed as being part of the "substantial evidence" test found in the Michigan Constitution.[17] See *Detroit Symphony Orchestra*, 393 Mich at 122-124 (reviewing documents concerning the Constitutional Convention in 1962 with respect to the meaning of "substantial evidence" and recognizing that it entails giving due deference to an agency's fact-finding); see also *In re Payne*, 444 Mich 679, 692; 514 NW2d 121 (1994) ("When reviewing the decision of an administrative agency for substantial evidence, a court should accept the agency's findings of fact if they are supported by that quantum of evidence. A court will not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record."). Accordingly, because MCL 24.248 and MCL 24.264 are

---

[17] "Substantial evidence" has been defined as evidence that a reasonable mind would accept as being adequate to support a decision, and it is more than a scintilla but can be substantially less than a preponderance of evidence. *Lewis*, 279 Mich App at 496.

not subject to the substantial evidence test, we cannot extend the due deference standard to those statutes on the basis of caselaw construing MCL 24.306(1)(d) and Const 1963, art 6, § 28.

Nevertheless, the principle of giving due deference to an agency with regard to fact-finding because of its expertise has become well established in our civil jurisprudence. We note this Court's discussion in *Mich Basic Prop Ins Ass'n v Office of Fin & Ins Regulation*, 288 Mich App 552, 560-561; 808 NW2d 456 (2010), regarding the nature of administrative agencies:

> Administrative agencies are created by the Legislature as repositories of special competence and expertise uniquely equipped to examine the facts and develop public policy within a particular field. Administrative agencies possess specialized and expert knowledge to address issues of a regulatory nature. Use of an agency's expertise is necessary in regulatory matters in which judges and juries have little familiarity. The relationship between the courts and administrative agencies is one of restraint, and courts must exercise caution when called upon to interfere with the jurisdiction of an administrative agency. Judicial restraint tends to permit the fullest utilization of the technical fact-finding expertise of the administrative agency and permits the fullest expression of the policy of the statute, while minimizing the burden on court resources. [Quotation marks, citations, and alterations omitted.]

We now invoke the separation of powers doctrine to incorporate a due deference standard with respect to agency fact-finding under MCL 24.248 and MCL 24.264. We earlier rejected any notion that the separation of powers doctrine precludes judicial review *altogether* in regard to a decision by an agency and the Governor to promulgate and enforce an emergency rule under MCL 24.248. We reached this conclusion because the Legislature, which enacted MCL 24.248, also enacted MCL 24.264, which provides for judicial review of the validity of rules in declaratory judgment actions.[18] But the silence in MCL 24.264, as well as in MCL 24.248, regarding any standard or scope of review to apply in judging factual findings by an agency connected to the promulgation of a rule provides an avenue to interject the application of separation of powers principles to create a standard that is deferential to the agency's factual findings. If the judiciary is given free reign to ignore factual findings made by an agency in promulgating rules and allowed to impose its own findings, the judiciary effectively tramples on the powers of the executive branch and improperly and effectively engages in quasi-legislative conduct.[19]

---

[18] We also note that the dissent in *Mich State AFL-CIO*, 230 Mich App at 26-43, opined that no judicial review was allowed regarding the factual finding of an emergency, which position the majority essentially ignored.

[19] We agree with Professor Don LeDuc's view that the failure "to give deference to the factual conclusions of an agency charged by the Legislature with responsibility to administer a statute and to substitute its judgment for that of the highest official in the executive branch regarding the existence of an emergency are both violative of the Constitution's separation of powers provisions." LeDuc, Michigan Administrative Law, § 4.38, p 244.

Accordingly, in the context of a declaratory judgment action, when a court reviews an agency's decision, concurred in by the Governor, that the preservation of the public health, safety, or welfare requires the promulgation of emergency rules absent notice and participation procedures, MCL 24.248(1), the court must accord due deference to the agency's expertise and not invade the agency's fact-finding by displacing its choice between two reasonably differing views. To be clear, however, giving due deference to agency fact-finding does not equate to subservience or complete capitulation and allow a reviewing court under MCL 24.248 and MCL 24.264 to abdicate entirely its role in determining the validity of an emergency rule.

## E. DISCUSSION

### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

We hold that even giving due deference to the DHHS and the Governor, we cannot conclude that the Court of Claims erred by finding that plaintiffs had demonstrated a likelihood of success on the merits at this stage of the proceedings with respect to their claim that the emergency rules were procedurally invalid.[20] The gist of defendants' position that emergency rules had to be promulgated is set forth in the introductory paragraph of their brief on appeal:

> Michigan undisputedly faces a youth vaping crisis, and each day that passes, this crisis is causing immediate and lasting harm to the public health of this state. E-cigarette use among high school and middle school students continues to skyrocket at alarming rates. *And kid-friendly flavored vaping products targeted to hook children on nicotine continues to present a grave public health emergency in our state.* Nicotine is highly addictive and negatively impacts the developing brain. Research shows that youth who use such products are significantly more likely to start smoking combustible cigarettes— notwithstanding the documented and well-known negative health consequences associated with the use of cigarettes. [Emphasis added.]

Again, MCL 24.248(1) provides that "[i]f an agency finds that preservation of the public health, safety, or welfare requires promulgation of an emergency rule without following the notice and participation procedures required by [MCL 24.241 and MCL 24.242] . . ., the agency may dispense with all or part of the procedures . . . ." We construe this language to allow for the promulgation of emergency rules but only if compliance with APA notice, hearing, and participation procedures will prevent an agency from being able to preserve the public's health, safety, or welfare. The evaluation requires contemplation of evidence showing the effect on the public health, safety, or welfare if enforcement of a proposed rule is delayed during the timeframe necessary to comply with notice, hearing, and participation procedures. Evidence of the events or circumstances that would likely transpire during the period of delay needs to be assessed for purposes of determining whether the public health, safety, or welfare would be sufficiently compromised so as to constitute an emergency and justify promulgation and

---

[20] But, as noted earlier, we do not believe that "procedural" invalidity is the proper characterization.

-23-

enforcement of emergency rules. The number of individuals whose health, safety, or welfare would be affected during the period of delay and the nature and seriousness of the impact on those individuals would be key factors to consider.

We think it would be helpful to provide a hypothetical, albeit a very simplistic, generalized one. If a delay in promulgating and enforcing a rule to satisfy APA notice and participation procedures would result in harm to 3% to 5% of the population, *which would otherwise not have occurred without the delay*, but the harm was fairly minor, it would be reasonable to conclude that the preservation of the public health, safety, or welfare would not require promulgation of an "emergency" rule without following procedural safeguards. If that hypothetical is tweaked so that the harm is elevated to likely death, it would be reasonable to conclude that the preservation of the public health, safety, or welfare would require promulgation of an "emergency" rule without following procedural safeguards. If we return to minor harm being involved but with 90% of the population being affected, an "emergency" rule would likely be justified.[21]

In the instant cases, defendants presented evidence that would lend support for a determination that use of e-cigarettes or vapor products by minors is an ever-worsening and serious public health concern and that flavored nicotine vapor products are at the forefront of driving and exacerbating the problem and leading youths to future nicotine addiction. Prohibiting altogether the sale and distribution of flavored nicotine vapor products would ostensibly curb youth vaping trends to some extent. Plaintiffs countered defendants' evidence with testimony by expert Amelia Howard that called into question the studies that defendants relied on.

Giving due deference to defendants' factual finding that the preservation of the public health, safety, or welfare required the promulgation of emergency rules absent notice and participation procedures, we nonetheless cannot conclude that the finding is reasonable. The case did not present a choice between two reasonably differing views on whether an emergency existed. Defendants did not, in any form or fashion, tailor the evidence or their arguments to the period of delay that would have occurred if notice, hearing, and participation procedures had been undertaken. Defendants did not present evidence indicating, showing, suggesting, or giving an opinion on: the number of youths who could be expected to start vaping for the first time during the period of delay because flavored nicotine vapor products remained on shelves; the danger of those first-timers becoming addicted to nicotine based solely on the use of flavored nicotine vapor products during the period of delay; and whether youths already using flavored nicotine vapor products would have a decreased chance of a healthier or addiction-free outcome if there was a period of delay.[22] Bluntly stated, defendants did not produce evidence that an emergency situation existed *such that a period of delay* would make any relevant difference in preserving the public's health, welfare, or safety. In sum, on the basis of the evidence presented

---

[21] The percentages used in our hypotheticals are for illustration purposes only.

[22] The equation should also involve consideration of the effect, if any, of 2019 PA 18, and whether, if there was no delay, any youths would turn to regular cigarettes.

at this stage of the proceedings, we agree with the Court of Claims that plaintiffs are likely to succeed on the merits regarding their shared request that the emergency rules be declared invalid. Defendants will still have the opportunity to attempt to gather the necessary evidence when the merits of plaintiffs' lawsuits are litigated.[23]

## 2. IRREPARABLE HARM

The Court of Claims found that plaintiffs had carried their burden of demonstrating irreparable harm. With respect to ACC, the Court of Claims determined that it had presented evidence of loss of goodwill and competitive position in the marketplace, which constituted irreparable harm because of the difficulty in calculating damages and because a significant loss of goodwill cannot be compensated by an award of economic damages. The Court of Claims found that the emergency rules effectively banned ACC from using its tradename and branding,[24] caused ACC to lose a significant portion of its sales, resulted in store closings, and were destroying the business. With respect to Slis, the Court of Claims determined that he had demonstrated irreparable harm because the emergency rules caused Slis to shutter his business, resulted in his customers obtaining flavored vaping products from Wisconsin, and will lead to the loss of his entire business.

Defendants argue that, in regard to ACC and lost goodwill, the Court of Claims erred on the issue of irreparable harm because ACC did not make a particularized showing that irreparable harm would in fact flow from rebranding itself to the extent necessary to comply with the emergency rules. Defendants contend that half of ACC's online sales occur out of state, which is beyond the reach of the emergency rules, and that the emergency rules would only temporarily bar ACC's misleading advertising practices as to the online sales in Michigan.

---

[23] We do question the reasoning of the Court of Claims that defendants had not shown the existence of an emergency because the studies, reports, and surveys they relied on were old and stale. The age of the studies, reports, and surveys did not necessarily mean that there was not a present, ongoing emergency, although current information would provide stronger evidence. We note that the Governor cited a 2019 study regarding the continuing increase in youth vaping in her certificate of need for extension of the emergency. Additionally, the Court of Claims, citing federal cases and pointing to the older studies originally relied on by defendants, stated that an agency cannot create an emergency by way of its own failure to act in timely fashion. We reject this approach in applying MCL 24.248(1) and note that the federal rulemaking statute has a general "good cause" requirement with respect to skipping procedural safeguards, 5 USC 553(b)(3)(B), which is not contained in MCL 24.248(1). An unreasonable delay in seeking to promulgate emergency rules does not mean that there is no continuing or worsening emergency. Moreover, if emergency rules are needed, even though they should have been promulgated earlier, the people of our state are entitled to protection and should not be put at risk because the DHHS moved too slow.

[24] Rule 3(1) of the emergency rules bars a retailer from using fraudulent and misleading terms in selling vapor products, and Rule 3(2) defines fraudulent or misleading terms as including, in part, the word "clean."

Defendants maintain, therefore, that ACC failed to show that it would have to rebrand itself entirely or that the extent of the required rebranding "would in fact cause loss so certain, pervasively destructive, and incalculable as to be irreparable." With respect to Slis, defendants argue that he failed to show that loss of his business was in fact the necessary consequence of the emergency rules. Defendants contend that the emergency rules still left room for Slis to make sales, considering that Slis could sell flavored nicotine vapor products outside of Michigan, that he could still sell tobacco-flavored vapor products and flavored vapor products lacking nicotine in Michigan, and that the emergency rules were only temporary.

In *Thermatool Corp*, 227 Mich App at 377, this Court discussed the irreparable-harm factor, observing:

> In order to establish irreparable injury, the moving party must demonstrate a noncompensable injury for which there is no legal measurement of damages or for which damages cannot be determined with a sufficient degree of certainty. The injury must be both certain and great, and it must be actual rather than theoretical. Economic injuries are not irreparable because they can be remedied by damages at law. A relative deterioration of competitive position does not in itself suffice to establish irreparable injury. [Citations omitted.]

In *Atwood Turnkey Drilling, Inc v Petroleo Brasileiro, SA*, 875 F2d 1174, 1179 (CA 5, 1989), the Fifth Circuit of the United States Court of Appeals observed:

> Petrobras directs our attention to cases holding that a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial. This is true as a general rule but an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business. [Citations omitted.[25]]

The threat of bankruptcy and the possibility of going out of business can constitute irreparable harm. *Id.*

As an initial point and as argued by Slis, there is a question whether plaintiffs would have any claim for money damages against the state defendants in light of immunity principles. See *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987). We do note that ACC alleged an unconstitutional takings claim against defendants and seeks $840,500 in just compensation for lost product. But this claim is for loss of product only and not loss of business. The Court of Claims did not speak to the matter, and we decline to resolve the issue because it is unnecessary for us to do so.

With respect to ACC, defendants' arguments only address the goodwill and rebranding issue connected to ACC's having the word "clean" in its name. But the Court of Claims also

---

[25] Decisions of lower federal courts are not binding on this Court, but may be considered for their persuasive value. See *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

based its decision on the significant loss of sales, store closings, and the possible collapse of the business, all of which found factual support in the record. "When an appellant fails to dispute the basis of a lower court's ruling, we need not even consider granting the relief being sought by the appellant." *Denhof v Challa*, 311 Mich App 499, 521; 876 NW2d 266 (2015). On this basis alone, we can affirm the finding of irreparable harm in regard to ACC.

Moreover, the Court of Claims was correct that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp v Scott*, 973 F2d 507, 512 (CA 6, 1992). Whether "the loss of customer goodwill amounts to irreparable harm often depends on the significance of the loss to the plaintiff's overall economic well-being." *Apex Tool Group, LLC v Wessels*, 119 F Supp 3d 599, 610 (ED Mich, 2015) (quotation marks and citation omitted).[26] Defendants argue that there was an evidentiary failure in regard to goodwill because ACC did not show any particular harm due to the loss of goodwill or that rebranding would not have been successful. Defendants' position, however, demands too much of ACC and is the very reason that loss of goodwill can constitute irreparable harm, i.e., the difficulty in measuring harm. David Haight of ACC testified that their products were branded with the ACC name, that the ACC name had been used for ten years, including online, and that ACC's customers knew and had become familiar with the ACC name.

With respect to both ACC and Slis, defendants' contention that the harm is only temporary misses the mark given that the emergency rules have now been extended another six months and that the plaintiffs presented evidence indicating that the businesses were in financial distress and danger even under the initial six-month period that the emergency rules were in effect. Furthermore, although defendants maintain that the DHHS has indicated that the emergency rules do not prohibit the sale or transportation of flavored nicotine vapor products to persons outside of Michigan, the rules themselves do not specifically exempt such activity. And even if that is the case, there is no indication that online sales of flavored nicotine vapor products outside of the state would prevent the collapse of the businesses. In regard to Slis, he testified that the emergency rules were resulting in a large loss of customers because most of them used flavored vapor products. He also indicated that his inventory was deteriorating and would definitely expire if an extension of the emergency rules was ordered, which has now occurred.

---

[26] Although the discussion was not in the context of analyzing the propriety of a preliminary injunction, this Court in *Unibar Maintenance Servs, Inc v Saigh*, 283 Mich App 609, 631; 769 NW2d 911 (2009), touched on the difficulty in proving certain damages:

> [T]he purpose of compensatory damages, which is to make the plaintiff whole, indicates that exemplary damages may be construed as appropriate for injuries to a corporation that cannot be measured or estimated in monetary terms. Clearly, a loss of reputation as a skillful company is unquantifiable and recoverable as exemplary damages, as may be a loss of goodwill, or any damage to other types of company reputation amongst either employees or customers. [Citations omitted.]

Slis further testified that he would have to close the doors to the business and file for bankruptcy if the emergency rules remained in force. This evidence sufficed to support the determination by the Court of Claims that Slis would suffer irreparable harm if a preliminary injunction did not issue.

In sum, the Court of Claims did not clearly err in concluding that both Slis and ACC would sustain irreparable harm if the emergency rules were not enjoined.

### 3. BALANCING THE HARMS

The Court of Claims concluded that the harm that would befall plaintiffs if no preliminary injunction were issued would outweigh the harm that would occur to defendants should a preliminary injunction be issued. The Court of Claims indicated that plaintiffs had demonstrated a risk of irreparable harm absent a preliminary injunction, which was greater than any risk of harm to defendants with an injunction in place, especially where defendants had not articulated that they would suffer any harm. The Court of Claims also stated that defendants would not suffer any harm if they were forced to comply with the APA's notice and participation procedures before implementing the rules regulating vapor products. The Court of Claims concluded that "the harm to defendants as state entities is neither compelling nor noteworthy."

Defendants essentially argue that a preliminary injunction enjoining enforcement of the emergency rules harms them by preventing defendants from carrying out their constitutional and statutory duties to protect and preserve the health, safety, and welfare of the people of this state, which in turn results in harm to the people themselves and the state's financial health. The preliminary injunction does not undercut the overall ability of the DHHS to promulgate valid emergency rules that meet the requirements of MCL 24.248(1), or from taking other appropriate steps to preserve the public's health, safety, and welfare. Under defendants' rationale, the harm to them would always trump the harm to a party challenging an emergency rule because defendants could claim that an injunction prevents them from protecting the public.[27] Also, the Legislature has already stepped in and taken some governmental action on the youth vaping "crisis" by amending the YTA, 2019 PA 18. We conclude that the Court of Claims did not clearly err regarding its finding on the balancing of harms.

### 4. THE PUBLIC INTEREST

The Court of Claims concluded that the public-interest factor favored neither plaintiffs nor defendants, finding compelling public interests on both sides of the issue. On one hand, the Court of Claims explained, an unknown number of minors would likely start using flavored nicotine vapor products. On the other hand, if the emergency rules were enforced, there was evidence that adult users of flavored vapor products would return to using combustible tobacco products, which the Court of Claims characterized as "more harmful" than vapor products.

---

[27] To the extent that defendants' argument entails consideration of harm to the public, we believe that said consideration pertains to the last factor that we shall examine—impact on the public interest.

-28-

Defendants argue that the Court of Claims erred because the evidence was overwhelming regarding the health dangers of nicotine addiction and that youths were starting down the path to nicotine addiction through the use of flavored nicotine vapor products, while plaintiffs' evidence that depriving adults of flavored nicotine vapor products would return many of them to smoking regular cigarettes was anecdotal and statistically unsupported.

Defendants are correct that they presented a plethora of evidence and studies showing the increase in and dangers of youths using flavored nicotine vapor products. As noted by the Court of Claims, however, plaintiffs "produced . . . literature citing improved health outcomes for former combustible tobacco users who switch to vaping products." The testimony of plaintiffs' witnesses also supported the view that the end of flavored nicotine vapor products would drive many users back to smoking cigarettes. We cannot conclude that the Court of Claims clearly erred in finding this factor neutral, but even if there was error and the factor should have been found in favor of defendants, reversal would still not be warranted considering that the other three factors favored the issuance of a preliminary injunction.

## V.  CONCLUSION

We hold that the DHHS and the Governor are entitled to due deference with regard to the finding of an emergency under MCL 24.248(1), but not complete capitulation, and the Court of Claims ultimately did not abuse its discretion by issuing the preliminary injunction on the basis of the evidence presented by the parties. The likelihood of success on the merits, whether plaintiffs would suffer irreparable harm, and the balancing of the harms favored the action by the Court of Claims to issue the preliminary injunction, even if the factor regarding the public interest did not. We hold that the Court of Claims did not abuse its discretion by granting plaintiffs' motions for a preliminary injunction.[28]

We affirm. Having fully prevailed on appeal, plaintiffs may tax costs under MCR 7.219.


/s/ Jane E. Markey
/s/ Kathleen Jansen
/s/ Mark T. Boonstra

---

[28] Given our ruling, it is unnecessary to address the other various issues and arguments raised in this consolidated appeal.

-29-